No. 96-1043

United States of America,     *
                              *
    Plaintiff - Appellee,      *
                              *   Appeal from the United States
    v.                         *   District Court for the
                              *   Western District of Missouri
Johnny Williams               *
a/k/a Doctor John,            *
                              *
    Defendant - Appellant.     *

Submitted:  September 11, 1996

Filed:    March 28, 1997

Before MAGILL, FLOYD R. GIBSON, and LAY, Circuit Judges.

FLOYD R. GIBSON, Circuit Judge.

    A jury convicted Johnny Williams of attempting to possess five or more kilograms of cocaine with the intent to distribute. See 21 U.S.C. §§ 841(a)(1), (b)(1)(A), 846 (1994). The district court[1] sentenced Williams to 121 months imprisonment, followed by five years of supervised release. Williams raises several issues on appeal. First, Williams contends that the district court should have suppressed the fruits of the wiretap surveillance of Williams's telephone line because the government failed to comply with the minimization requirements of 18 U.S.C. § 2518(5) (1994).

---

[1]The HONORABLE HOWARD F. SACHS, Senior Judge, United States District Court for the Western District of Missouri.

Second, Williams claims error in the district court's decision to allow the government to introduce records into evidence without laying a proper foundation. Third, Williams asserts that the district court's entrapment instruction prejudiced Williams and prevented him from receiving a fair trial. Finally, Williams raises three sentencing issues. He contends that the district court committed error when it calculated Williams's base offense level at 32, failed to recognize that the government engaged in sentencing entrapment, and failed to grant Williams his right of allocution pursuant to Fed. R. Crim. P. 32(c)(3)(C). For the reasons set forth below, we affirm Williams's conviction and sentence.

## I.  BACKGROUND

In December 1992 Adriana Roman began transporting cocaine from Houston, Texas to Kansas City, Missouri. In May 1993 Houston Police Detective Virgil Price approached Roman because he suspected she was a drug courier. Roman agreed to act as an informant for the Houston Police Department. Price later introduced Roman to FBI Agent Marlin Ritzman, and in June of 1993 Roman agreed to act as an informant for the FBI. Roman told Ritzman she made the following deliveries of cocaine to Kansas City from Houston: (1) five kilograms in December 1992; (2) five kilograms in early January 1993; (3) five kilograms in late January 1993; (4) eight kilograms in March 1993; and (5) three kilograms in May 1993. Roman told Ritzman that on each occasion she called either Williams or another drug dealer upon her arrival in Kansas City. On the occasions that Roman called Williams, he sometimes directly participated in the transactions, but at other times, Williams sent a messenger to collect the cocaine from Roman.

2

Based on the information supplied by Roman, the FBI applied for authorization to conduct surveillance of Williams's telephone line pursuant to 18 U.S.C. §§ 2510-2522 (1994).  On September 15, 1993, the district court[2] authorized surveillance for a period of thirty days.[3]  Because the FBI wished to establish Williams's willingness to deal in cocaine, Ritzman directed Roman to initiate contact with Williams.  On September 22 Roman called Williams and persuaded him to meet her at a Kansas City motel to discuss a possible cocaine delivery.  The FBI video taped the meeting, during which Williams suggested a delivery of one and one-half to two kilograms of cocaine.  Roman, at the FBI's direction, informed Williams that because she had to travel to Michigan to visit her son, Williams should not expect to hear from her for at least a week.  Williams responded that had he known of Roman's plans, she could have delivered the cocaine to him on her way to Michigan and retrieved the purchase money on her return trip through Kansas City.  He agreed, however, to accept one and one-half to two kilograms of cocaine as soon as Roman was able to deliver the controlled substances.  After the meeting concluded, Ritzman decided to attempt a reverse sting[4] on Williams and instructed Roman not to initiate contact with Williams until advised.  However, shortly following the meeting, Roman made unauthorized

---

[2]The HONORABLE JOSEPH E. STEVENS, JR., then Chief Judge of the United States District Court for the Western District of Missouri and now Senior United States District Judge for the same court.

[3]During the thirty day surveillance period, the FBI intercepted 219 pertinent conversations and 2,164 nonpertinent conversations.  Of the intercepted conversations, 1,172 were minimized to avoid the interception of calls which were noncriminal in nature.

[4]A reverse sting is "an operation in which a government agent sells or negotiates to sell a controlled substance to a defendant." U.S. Sentencing Guidelines Manual § 2D1.1, application note 15 (1995).

contact with Williams and asked him to send money so she could rent a car to deliver cocaine to Kansas City. Roman actually made the request for money because she needed cash to pay rent and other bills. Williams, using the alias "Charlie Ward," wired Roman two hundred dollars.

On October 13, 1993, Ritzman received approval to attempt the reverse sting. Roman called Williams on October 13 to confirm delivery for October 14, 1993. As advised by Ritzman, Roman asked Williams if she could bring five kilograms rather than the previously agreed-upon one and one-half to two kilograms. Williams approved of Roman's request to deliver five kilograms of cocaine.

On October 14 the FBI flew Roman to Kansas City and escorted her to the American Inn where the agents planned to execute the reverse sting. The FBI had rented three rooms at the American Inn. Roman was to meet with Williams in one room. The FBI wired another room with audio and video surveillance equipment, and set up the third room to observe Williams as he entered and exited the room in which the reverse sting was to take place. FBI Special Agent Pisterzi obtained five single kilogram packages of cocaine from the DEA lab in Chicago, which he brought to the hotel for use in the reverse sting. Ritzman placed the packages of cocaine in a gym bag, and placed the bag in one of the hotel rooms with Roman. Shortly after noon, Roman telephoned Williams to tell him she was at the American Inn. Williams arrived soon thereafter.

Williams entered the hotel room and examined the five kilogram packages of cocaine. He took one package out of the gym bag. Williams then resituated the other four packages of cocaine and hid them in the room. Williams gave Roman two hundred dollars so she could get something to eat. He then advised her that he would return shortly for the other four packages of cocaine and that, in

4

the meantime, she should "guard [the cocaine] with [her] life."  Williams exited the room with one package of cocaine and was immediately apprehended by Ritzman.  Ritzman released Williams based on Williams's promise to cooperate with the FBI.  When Williams failed to cooperate, he was indicted and charged with attempting to possess at least five kilograms of cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), 846 (1994).  A jury found Williams guilty of the charged offense, and the district court sentenced Williams to 121 months imprisonment followed by five years of supervised release.

## II.  DISCUSSION

### A.  Minimization of Wiretap Surveillance

Williams contends that all evidence obtained from the wiretap surveillance should have been suppressed because the government's procedures did not comply with the minimization requirements of 18 U.S.C. § 2518(5) (1994).  Subsection five of 18 U.S.C. § 2518 requires that an order authorizing the interception of wire communications must ensure that the surveillance will "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception . . . ."  18 U.S.C. § 2518(5) (1994).  Whether the government complied with the requirements of section 2518(5) is determined by an objective, reasonableness standard.  See Scott v. United States, 436 U.S. 128, 137–38 (1978); United States v. Macklin, 902 F.2d 1320, 1328 (8th Cir. 1990), cert. denied, 498 U.S. 1031 (1991).

When determining whether the government's surveillance was reasonable, "a reviewing court must consider a variety of factors, including the scope of the enterprise, the agent's reasonable expectation of the content of a call, the extent of judicial supervision, length and origin of a call, and use of coded or ambiguous language." Macklin, 902 F.2d at 1328 (citations omitted). After a consideration of these factors, we conclude that the government agents in this case acted reasonably in efforts to comply with the minimization requirements of section 2518(5). The order authorizing the wiretap named nine interceptees because at the outset of the investigation the FBI believed many people were involved in the drug trafficking. If an intercepted phone call involved one or more nonnamed interceptees and was noncriminal in nature, the order required the listening agent to minimize the call. The order also required the FBI to submit ten-day reports to the authorizing judge to ensure that proper minimization techniques were being used. Several of the individual phone calls contested by Williams were extremely short in duration. In these calls, listening agents barely had ample time to determine whether the speakers were named interceptees before the calls terminated. Cf. Scott, 436 U.S. at 141-42. The remaining calls challenged by Williams were ambiguous in nature and included language the agents reasonably could have believed was coded language referring to possible cocaine transactions. More extensive wiretapping is reasonable when "the conversations are in the jargon of the drug trade." Macklin, 902 F.2d at 1328 (citation omitted). Therefore, the government agents in this case acted reasonably in efforts to comply with the minimization requirements of section 2518(5).

**B.  Evidentiary Foundation**

6

Williams renews the objection he made at trial that records from two hotels and Western Union should not have been admitted into evidence because the government failed to call a custodian of records to lay a foundation for the business records hearsay exception of Fed. R. Evid. 803(6). Williams contends that the records were significant because they corroborated Roman's testimony about her previous involvement in transporting cocaine to Williams from Houston. However, assuming the records were inadmissible hearsay, any error in admitting the records was harmless.

An evidentiary error is harmless if, "after viewing the entire record, the reviewing court determines that no substantial rights of the defendant were affected, and that the error had no, or only slight, influence on the verdict." United States v. Mitchell, 31 F.3d 628, 632 (8th Cir. 1994)(citations omitted). After a careful examination of the record, we determine that any error in the admission of the records had no effect on Williams's substantial rights and little or no influence on the verdict. To achieve a conviction the government was required to establish that Williams attempted to possess five or more kilograms of cocaine with the intent to distribute the cocaine. See 21 U.S.C. §§ 841(a)(1), (b)(1)(A), 846 (1994). If the district court had not permitted the government to introduce the hotel and Western Union records, the remaining evidence would have nonetheless overwhelmingly established Williams's guilt. The government introduced, inter alia, (1) Roman's testimony regarding Williams's previous involvement in cocaine transactions; (2) tape recorded conversations between Roman and Williams in which Williams alluded to his prior and intended future involvement in cocaine transactions; and (3) most significantly, a video tape of Williams's attempted purchase of five kilograms of cocaine at the American Inn. Consequently, due to the powerful additional

evidence of Williams's guilt, the district's court admission of the records, if erroneous, had little or no influence on the jury's verdict and did not affect Williams's substantive rights.

**C. Entrapment Instruction**

Williams urged the district court to use Eighth Circuit Pattern Instruction 9.01 to instruct the jury on the law of entrapment. The court modified Instruction 9.01 by adding a paragraph in an attempt to clarify the factual predicate required for a finding of entrapment. Williams argues that the district court abused its discretion in submitting Instruction J[5] to the

---

[5]Instruction J read as follows:

One of the issues in this case is whether Mr. Williams was entrapped. If Mr. Williams was entrapped, he must be found not guilty. The Government has the burden of proving beyond a reasonable doubt that Mr. Williams was not entrapped.

If Mr. Williams before contact with Adriana Roman in the summer of 1993 did not have any disposition to commit the crime charged and was induced or persuaded by Adriana Roman to commit that crime, then he was entrapped. On the other hand, if Mr. Williams before contact with Adriana Roman in the summer of 1993 did have a disposition to commit the crime charged then he was not entrapped, even though Adriana Roman provided a favorable opportunity to commit the crime or made committing the crime easier or even participated in acts essential to the crime.

If the proof has persuaded you, beyond a reasonable doubt, that (1) defendant Williams knew or suspected, before the summer of 1993, that Adriana Roman had been engaged in drug trafficking, and (2) defendant thereafter invited or encouraged her to supply drugs to him, and (3) defendant Williams was willing to deal in drugs, and did not require persuasion from Adriana Roman, then he was not entrapped, even though Adriana Roman presented defendant with an opportunity to acquire cocaine. If the proof has not persuaded you beyond a reasonable doubt that defendant was not entrapped, as that term is here

jury because the modified version was confusing and tended to emphasize the government's version of the facts. We review a district court's formulation of jury instructions for an abuse of discretion. See United States v. Parker, 32 F.3d 395, 400 (8th Cir. 1994). Although a defendant is entitled to have an instruction submitted to the jury provided it is timely submitted, adequately states the law, and is supported by the evidence, see United States v. Akers, 987 F.2d 507, 513 (8th Cir. 1993), "the defendant is 'not entitled to a particularly worded instruction where the instruction[] given by the trial judge adequately and correctly cover[s] the substance of the requested instruction.'" Id. (alterations added)(quoting United States v. Manning, 618 F.2d 45, 48 (8th Cir. 1980)).

Entrapment exists "where the evidence establishes that the government agent originated the criminal design, the agent implanted in the mind of an innocent person the disposition to commit the offense, and the defendant then committed the criminal act at the urging of the government agent." United States v. Hulett, 22 F.3d 779, 781 (8th Cir.)(citation omitted), cert. denied, 115 S. Ct. 217 (1994). Williams asserts that the last paragraph of Instruction J "improperly emphasized factual contentions raised by the government," and therefore made it less likely that the jury would find the government entrapped Williams. We disagree. Instruction J's final paragraph presented a relatively neutral clarification of the law of entrapment based on the facts of the case. When considered in its entirety, the instruction essentially asked the jury to determine "whether [Roman] caused or induced [Williams] to commit a crime he was not

---

explained, then you must find the defendant not guilty.

otherwise predisposed to commit."  Id. (citation omitted).  Because the district court's entrapment instruction adequately stated the law of entrapment and covered the substance of Williams's requested instruction, we find that the district court did not abuse its discretion in submitting Instruction J to the jury.

**D.  Sentencing Issues**

**1.    Weight Calculation**

The sentencing court found that Williams was responsible for at least five but not more than fifteen kilograms of cocaine and accordingly calculated his base offense level at 32.  See U.S. Sentencing Guidelines Manual § 2D1.1(c)(4) (1995).  The court sentenced Williams to 121 months imprisonment, which was within the guidelines range of 121-151 months. Williams contests the weight calculation, arguing that he did not intend to purchase nor was he reasonably capable of purchasing five kilograms of cocaine.  See id., application note 12.

We review factual findings by the sentencing court for clear error and reverse only "if we are left with the definite and firm conviction that the sentencing court erred."  United States v. Garrido, 995 F.2d 808, 812 (8th Cir.)(citation omitted), cert. denied, 510 U.S. 926 (1993).  We review the sentencing court's application of the Sentencing Guidelines de novo. See United States v. Stavig, 80 F.3d 1241, 1245 (8th Cir. 1996).  We may affirm the sentencing court's decision on any ground supported by the record.  See Garrido, 995 F.2d at 813.

The Presentence Investigation Report (PSI) prepared by the probation officer recommended that the sentencing court hold

10

Williams accountable for twenty-eight kilograms of cocaine that were part of the same course of conduct as the charged offense. See id. § 1B1.3. Had the district court followed this recommendation, Williams's base offense level would have been 34, requiring a sentence of 151-181 months. See id. § 2D1.1(c)(3). The court, however, found that Roman's testimony was not sufficiently reliable to attribute twenty-eight kilograms of cocaine to Williams as relevant conduct. Furthermore, the cocaine used in the reverse sting was "a shade short of the five kilograms" because it was not weighed separately from its wrappings. Nonetheless, the district court estimated that Williams was responsible for between five and fifteen kilograms of cocaine. The sentencing court based this estimation on two alternative theories. First, the court adduced that Williams could be held accountable for between five and fifteen kilograms of cocaine because although Roman's testimony regarding relevant conduct was not entirely reliable, it sufficiently established that Williams was at least 5% culpable for the previous twenty-eight kilograms, which placed Williams at or above the five kilogram threshold. Alternatively, the court reasoned that Williams should be held responsible for five kilograms of cocaine because that was the amount he intended to purchase from Roman.

Williams asserts that the sentencing court committed clear error when it set his base offense level at 32 based on his prior relevant conduct. Williams claims that the sentencing court arbitrarily allocated his level of culpability and failed to make specific factual findings of his involvement in the previous transactions as required by Fed. R. Crim. P. 32(c). We agree that the sentencing court arbitrarily allocated Williams's level of involvement in the previous transactions. Although the sentencing guidelines allow for the approximation of the amount of controlled substances involved in prior relevant transactions, U.S. Sentencing

11

Guidelines Manual §2D1.1, application note 12 (1995), a sentencing court may not base a quantity determination upon an arbitrary assumption. See United States v. Lawrence, 915 F.2d 402, 409 (8th Cir. 1990). Similarly, we hold that a sentencing court may not base a determination of a defendant's level of involvement in previous transactions upon an arbitrary assumption. A sentencing court may not attribute responsibility to a defendant for quantities of cocaine involved in a previous transaction "unless the court can conclude the defendant is more likely than not actually responsible for a quantity greater than or equal to the quantity for which the defendant is being held responsible." United States v. Walton, 908 F.2d 1289, 1302 (6th Cir.)(emphasis in original), cert. denied, 498 U.S. 990 (1990); accord Lawrence, 915 F.2d at 409.

At Williams's sentencing hearing the court indicated its discomfort with assessing Williams's level of involvement in previous transactions. The court stated:

> Well, I think the basic trouble I have is pegging a figure.
>     . . . If we don't hold him for the total, then I don't think I can rely on the Adriana Roman testimony to say, well, it was this transaction, and there were a certain number of kilograms there and so forth.
>     The closest thing to that is the Paradise Motel. If her testimony is as confused as I believe it was . . . I am not comfortable saying, well, I believe he was out at the Paradise Motel and that there were a certain number of kilograms.
>     . . . [T]he Eighth Circuit will have to give me some guidance as to whether I can pick a number out of the air.

Sentencing Tr. at 30-32. Later, the court stated that Williams's responsibility for prior transactions "[could] not be fairly estimated." Id. at 88. Nonetheless, the court determined that

12

Williams could be held accountable for between five and fifteen kilograms of cocaine because Roman's testimony regarding relevant conduct sufficiently established that Williams was at least 5% culpable for the previous transactions. Such an arbitrary allocation of a defendant's involvement in previous transactions is impermissible.

Nevertheless, we conclude that five kilograms was the appropriate weight of cocaine to attribute to Williams under application note twelve of section 2D1.1 because that is the amount of cocaine Williams agreed to purchase from Roman. U.S. Sentencing Guidelines Manual § 2D1.1, application note 12 (1995).

The relevant portion of application note twelve provides:

> In an offense involving an agreement to sell a controlled substance, the agreed-upon quantity of the controlled substance shall be used to determine the offense level unless the sale is completed and the amount delivered more accurately reflects the scale of the offense. . . . In contrast, in a reverse sting, the agreed-upon quantity of the controlled substance would more accurately reflect the scale of the offense because the amount actually delivered is controlled by the government, not the by defendant. If, however, the defendant establishes that he or she did not intend to provide, or was not reasonably capable of providing, the agreed-upon quantity of the controlled substance, the court shall exclude from the offense level determination the amount of controlled substance that the defendant establishes that he or she did not intend to provide or was not reasonably capable of providing.

Id.

The application note plainly states that in a reverse sting the agreed-upon quantity of cocaine determines the offense level. Because Williams agreed to purchase five kilograms of cocaine, he

13

should be sentenced based on that amount. On September 22, 1993, Roman and Williams met in a motel room to discuss the possibility of future cocaine transactions. During the meeting, Williams assured Roman that he would be able to sell the cocaine if she could deliver it to Kansas City. Williams indicated an interest in purchasing one and one-half to two kilograms of cocaine, but hinted toward future deals where he would purchase larger amounts. During a September 25 phone call Roman suggested a purchase price of $18,000 per kilogram which Williams agreed was a very good price. Williams sent Roman $200 to enable her to transport the cocaine to Kansas City. Roman called Williams on October 13 to inform him that she had the cocaine and would be arriving in Kansas City the next day. However, she asked Williams if she could bring five kilograms rather than the previously agreed-upon one and one-half to two kilograms. Williams immediately responded that a five kilogram amount was acceptable. On October 14 Williams met Roman at the motel to complete the transaction. When Roman displayed the five kilogram packages of cocaine, Williams instantly embraced her. Williams asked Roman several questions to solidify the terms of the deal. He asked if the price was still $18,000 per kilogram, if each package actually weighed a kilogram, and how much compensation Roman expected for transporting the cocaine. Williams gave Roman clear directions that he would take one kilogram right away and would return later that afternoon for the other four packages. Williams instructed Roman that until he returned, she should guard the other four kilograms "with [her] life." Williams admitted at trial that he planned on returning for the remaining four kilograms. Trial Tr. at 453. Based on his own words and actions, Williams agreed to purchase five kilograms of cocaine. Therefore, application note twelve requires that he be sentenced based upon that amount.

14

Williams also contends that the sentencing court erred when it failed to make specific factual findings of his involvement in previous transactions as required under Fed. R. Crim. P. 32(c)(1). Because Williams's sentence is affirmed based only upon the amount of cocaine involved in the reverse sting transaction, rather than past relevant transactions, any error the sentencing court may have made in failing to make specific factual findings under Rule 32(c)(1) amounted to harmless error.  See United States v. Beatty, 9 F.3d 686, 690 (8th Cir. 1990)(applying harmless error analysis to improper factual findings under Rule 32).

Williams argues that the last sentence of application note 12 applies to reverse sting operations and that therefore his sentence should not be based on five kilograms of cocaine because he did not intend to purchase nor was he reasonably capable of purchasing that amount.  Prior to the 1995 amendment to application note 12, the language of the note did not specify whether it applied to reverse sting operations.[6]  This Court, though, interpreted the previous version of application note twelve as applying to reverse stings, see Stavig, 80 F.3d at 1246; United States v. Nichols, 986 F.2d 1199, 1204 (8th Cir. 1993), including the portion of the note which stated that a defendant would not be sentenced based on the full

---

[6]The previous version of note twelve read in relevant part:

In an offense involving negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount.  However, where the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount, the court shall exclude from the guideline calculation the amount that it finds the defendant did not intend to produce and was not reasonably capable of producing.

U.S. Sentencing Guidelines Manual § 2D1.1, application note 12 (1994).

amount of controlled substances involved if he "did not intend to produce and was not reasonably capable of producing" the negotiated amount. U.S. Sentencing Guidelines Manual § 2D1.1, application note twelve (1994); see Stavig, 80 F.3d at 1246; Nichols, 986 F.2d at 1204. Although the 1995 amendment to note twelve explicitly clarifies that the agreed-upon quantity of cocaine controls the weight determination in a reverse sting operation, the amendment renews speculation as to whether a sentencing court is required to exclude from consideration "the amount of controlled substance that the defendant establishes that he or she did not intend to provide or was not reasonably capable of providing." U.S. Sentencing Guidelines Manual § 2D1.1, application note 12 (1995).

Currently, only the Court of Appeals for the Second Circuit has ruled on whether the last sentence of note twelve applies to reverse stings. United States v. Gomez, 103 F.3d 249 (2d Cir. 1997). The Second Circuit concluded that the last sentence of note 12 applies only in conventional sting operations where the defendant is the supplier rather than the buyer of controlled substances. Id. at 253-54.[7] Prior to the amendment of application

---

[7]The court reasoned that the plain language of the sentence in question refers only to a situation in which a defendant does not intend to or is not reasonably capable of producing controlled substances, as opposed to a situation in which the defendant does not intend to or is not reasonably capable of producing the funds necessary to purchase the controlled substances. See Gomez, 103 F.3d at 253. The court noted that "'[w]here a seller neither intends nor is able to produce the [agreed-upon] quantity of narcotics, the Guidelines simply recognize that the crime could not have been committed as planned. Where the defendant is a buyer, however, and [agrees upon] a particular quantity, he or she fully intends to commit the crime as planned.'" Id. (quoting United States v. Alaga, 995 F.2d 380, 383 (2d Cir. 1993), cert. denied, 510 U.S. 1075 (1994)).

16

note twelve, this Court,[8] as well as most other circuit courts of appeals,[9] required a sentencing judge to reduce a defendant's sentence by the amount of controlled substances the defendant did not intend to purchase and was not reasonably capable of purchasing.[10]

This panel is split on the issue of whether the last sentence of the 1995 version of note twelve applies to reverse stings.  We need not decide the scope of note twelve's application in this case, leaving that issue to another day, because even if we applied the last sentence of note twelve to reverse sting operations, Williams both intended to and was reasonably capable of purchasing the agreed-upon five kilograms of cocaine.  As noted by the

---

[8]See Stavig, 80 F.3d at 1246; Nichols, 986 F.2d at 1204; United States v. Brown, 946 F.2d 58, 60 n.3 (8th Cir. 1991); but see United States v. Robinson, 22 F.3d 195, 196 (8th Cir. 1994) (stating uncertainty as to note twelve's application to reverse sting operations).

[9]See United States v. Naranjo, 52 F.3d 245, 250 n.12 (9th Cir. 1995); United States v. Jean, 25 F.3d 588, 598 (7th Cir. 1994); United States v. Brown, 985 F.2d 766, 768-69 (5th Cir. 1993); United States v. Gates, 967 F.2d 497, 500 (11th Cir.), cert. denied, 506 U.S. 1011 (1992); United States v. Panet-Collazo, 960 F.2d 256, 261 (1st Cir.), cert. denied, 506 U.S. 876 (1992); United States v. Brooks, 957 F.2d 1138, 1150-51 (4th Cir.), cert. denied, 505 U.S. 1228 (1992).  But see United States v. Alaga, 995 F.2d at 383.

[10]The current version of note twelve requires the court to exclude from the offense level determination the amount of controlled substances either that the defendant did not intend to produce **or** was not reasonably capable of producing.  U.S. Sentencing Guidelines Manual § 2D1.1, application note 12 (1995). The previous version of note 12, however, required the court to exclude the amount from consideration only when the defendant could show both that he did not intend to produce **and** was not reasonably capable of producing the negotiated amount.  U.S. Sentencing Guidelines Manual § 2D1.1, application note 12 (1994). We modify our analysis to reflect this change.

17

sentencing court, Williams never declined the five kilogram transaction and, in fact, seemed "jubilant over the prospect."  Sentencing Tr. at 87. Thus, Williams signaled his intent to proceed as planned.  We similarly conclude that Williams was reasonably capable of purchasing the agreed-upon five kilograms of cocaine.  Williams indicated that he would sell the cocaine to his contacts and then would pay Roman $18,000 per kilogram from the proceeds of his sales plus an additional $1,500 per kilogram bonus for Roman's part in the transaction.  When Williams met Roman on Thursday, October 14 he assured her that he would have half of the money by Saturday. At all times, Williams appeared to be confident that he would have no problem selling the cocaine and providing payment at an acceptable time.[11] We therefore conclude that, if the last sentence of application note twelve applies to reverse sting defendants, Williams intended to purchase and was reasonably capable of purchasing five kilograms of cocaine.

### 2.    Sentencing Entrapment

Williams further argues that the sentencing court should have reduced the weight of cocaine used to calculate his base offense level because the government engaged in sentencing entrapment.[12]

---

[11]We note that "fronting" cocaine on a credit basis is an accepted practice in the drug trade.  See Nichols, 986 F.2d at 1205; United States v. O'Meara, 895 F.2d 1216, 1220-21 (8th Cir.), cert. denied, 498 U.S. 943 (1990).

[12]Williams characterizes the government's conduct as "sentencing manipulation."  However, Williams contends that the government lured him into purchasing a larger quantity of cocaine than he was predisposed to purchase before his contact with Roman.  This situation accurately describes sentencing entrapment, see United States v. Shephard, 4 F.3d 647, 649 (8th Cir. 1993), cert. denied, 510 U.S. 1203 (1994), while  sentencing manipulation more aptly refers to a scenario in which the government prolongs an investigation merely to increase the sentence.  Id.  We therefore approach Williams's argument as one alleging sentencing entrapment rather than sentencing manipulation.

18

Sentencing entrapment occurs "'where outrageous government conduct overcomes the will of a defendant predisposed to deal only in small quantities of drugs, for the purpose of increasing the amount of drugs and the resulting sentence imposed against that defendant.'" Stavig, 80 F.3d at 1245 (quoting United States v. Aikens, 64 F.3d 372, 376 (8th Cir. 1995), cert. granted and judgment vacated on other grounds, 116 S. Ct. 1346 (1996)). This is simply not a case where the government overcame the defendant's predisposition to deal in small amounts of cocaine. The evidence established Williams's predisposition to deal in five kilogram quantities of cocaine.

### 3. Allocution

Finally, Williams asserts that the case should be remanded for resentencing because the district court failed to provide him with his right of allocution as required by Fed. R. Crim. P. 32(c)(3)(C). Rule 32(c)(3)(C) requires the district court, before imposing a sentence upon the defendant, to address the defendant personally and inquire whether the defendant wishes to make a statement in mitigation of his sentence. Failure to comply with this rule mandates remand for resentencing. See United States v. Walker, 896 F.2d 295, 301 (8th Cir. 1990). However, if, after imposing the sentence, a trial judge realizes the defendant has not been afforded his right to allocution, the judge may correct the omission by reopening the sentencing proceeding and subsequently addressing the defendant pursuant to Rule 32. See United States v. Barnes, 948 F.2d 325, 331 n.5 (7th Cir. 1991)("[A] trial judge, realizing after sentencing that the right of allocution has been

neglected, may rectify the situation by, in effect, setting aside the sentence, reopening the proceeding, and inviting the defendant to speak."); United States v. Pelaez, 930 F.2d 520, 523-24 (6th Cir. 1991)(reversing a sentence because the district court had no intention of reconsidering the sentence, even though defendant was given an opportunity to address the court following sentencing); Gordon v. United States, 438 F.2d 858, 882 (5th Cir. 1971)(affirming the district court's sentence where defendant was given an opportunity to address the court after the court imposed an initial sentence but before the sentencing proceeding concluded), cert. denied, 404 U.S. 828 (1971).  This case presents a situation where the sentencing judge realized his failure to call upon the defendant and remedied the error by subsequently addressing the defendant and allowing him to speak in mitigation of his sentence.  After the sentencing judge announced Williams's sentence, the following exchange took place:


[WILLIAMS]:      Your Honor, may I say something?

THE COURT: Yes.

[WILLIAMS]:      I know the sentence has been --

THE COURT: I am sorry.  I have made a serious mistake
            in not calling on you before sentencing.

[WILLIAMS]:      I am sorry.

THE COURT: No, I am glad that you said you want
        to say something, because you are entitled
        to address me before sentencing.
                    So, you tell me anything you want to.
              I am not going to read this again, but I
              will consider whatever you have to say.

Sentencing Tr. at 96. After Williams informed the court of many concerns he had regarding the investigation of the case, the sentencing judge addressed Williams's attorney:

> THE COURT: Mr. Bath, I did misspeak in reading the sentencing material before calling on Mr. Williams. I am sentencing him to the minimum under my findings.
>
> If there is a desire for me to make some further record of reconsidering and sentencing, again after hearing from him, I would do that.
>
> MR. BATH: No, sir, we don't have that request, Your Honor.

Sentencing Tr. at 101. We conclude that the sentencing judge corrected his initial failure to provide Williams's right of allocution by subsequently allowing Williams to address the court and asking Williams's attorney if he would like him to re-read the sentence after considering Williams's testimonial. Therefore, Williams was accorded his right of allocution pursuant to Rule 32(c)(3)(C), and resentencing is not required.

## III. CONCLUSION

For the reasons set forth above, we affirm Williams's conviction and sentence.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

21