# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

————————

No. 04-3256

————————

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Northern |
| | * | District of Iowa. |
| Timothy Martin Kendrick, | * | |
| | * | |
| Appellant. | * | |

————————

Submitted: March 4, 2005
Filed: September 8, 2005

————————

Before BYE, JOHN R. GIBSON and GRUENDER, Circuit Judges.

————————

GRUENDER, Circuit Judge.

A jury convicted Timothy Martin Kendrick of three counts of distributing and one count of conspiring to distribute methamphetamine. He appeals the district court's[1] refusal to include a jury instruction on entrapment. He also challenges his sentence, arguing that the district court erred in finding he was a career offender and

_____

[1]The Honorable Linda R. Reade, United States District Judge for the Northern District of Iowa.

abused its discretion in denying him a reduction for acceptance of responsibility. We affirm his conviction and sentence.

## I.     BACKGROUND

Around March 2001, Kendrick moved from Alabama to Waterloo, Iowa. Within months of his arrival in Waterloo, Kendrick resumed the abuse of illegal drugs. As his habit became more regular, Kendrick testified that he began to make purchases of marijuana and methamphetamine from a drug dealer known as "Jen," to whom he was introduced by a mutual acquaintance. Unbeknownst to Kendrick, Jen was a confidential informant working with local law enforcement.

On July 9, 2001, Jen introduced Kendrick to Kenneth Harms. Over the course of the next month, Kendrick made approximately five or six purchases of methamphetamine from Harms. The two also developed a personal relationship, which included confiding in one another about their drug habits and assisting each other in obtaining more drugs. For example, Kendrick confided in Harms that he was an intravenous drug user and that he would sell a portion of each methamphetamine purchase to people living in his trailer court. In addition, Harms helped Kendrick sell his Firebird to Bobby Reyes, Harms's methamphetamine supplier, for approximately $700 and one-half ounce of methamphetamine.

Jen also introduced Kendrick to William Herkelman, an undercover officer with the Black Hawk County Sheriff's Department. Between this initial introduction and July 19, 2001, Kendrick sold Jen and Herkelman small quantities of methamphetamine. On July 19, 2001, Herkelman executed a controlled buy of methamphetamine from Kendrick. Kendrick sold Herkelman 6.75 grams of methamphetamine for $450. Jen was not involved in arranging the July 19 controlled buy and did not accompany Herkelman to Kendrick's residence for the controlled buy.

On July 24, 2001, Herkelman contacted Kendrick about the possibility of obtaining more methamphetamine. Over the course of three secretly recorded telephone conversations, the two discussed various issues involved in the business of selling methamphetamine, such as price and quantity. Three days later, Herkelman arrived at Kendrick's place of employment at the Triple J Mart to consummate another controlled buy. Kendrick told Herkelman that his supplier would arrive shortly and was driving a brown, four-door car. While Herkelman waited in his car, Kendrick's supplier, who was identified by law enforcement as Harms, arrived in a brown Ford car. After Harms left, Kendrick approached Herkelman in the parking lot and sold him 6.69 grams of methamphetamine for $525. The two then discussed the sale of another ounce of methamphetamine. Again, Jen was not involved in arranging the July 27 controlled buy and did not accompany Herkelman to the Triple J Mart for the controlled buy.

On July 30, 2001, Herkelman and Kendrick met in the parking lot of another convenience store. Kendrick sold Herkelman 12.7 grams of methamphetamine for $950. After the transaction was completed, law enforcement surreptitiously followed Kendrick to Harms's residence in Cedar Falls, Iowa. Kendrick left Harms's residence approximately seven minutes after he arrived.

Kendrick was indicted on October 25, 2002 for one count of conspiring to distribute methamphetamine, in violation of 21 U.S.C. §§ 841 and 846, and three counts of distributing methamphetamine after having been convicted of a felony drug offense, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) and 851. In the same indictment, Harms was charged with one count of conspiring to distribute methamphetamine, seven counts of distributing methamphetamine and one count of being a drug user in possession of a firearm, in violation of 18 U.S.C. § 922(g)(3). Harms subsequently entered a guilty plea and agreed to cooperate. Kendrick, however, entered a plea of not guilty and proceeded to trial.

At trial, Kendrick admitted that he was a drug user but denied that he was a drug dealer. According to Kendrick, his foray into the business of selling methamphetamine began when Reyes insisted on paying for his Firebird partly with methamphetamine. Unsure of how to dispose of the methamphetamine, Kendrick testified that he asked Jen for help in "getting rid of the rest" of the drugs. Jen apparently encouraged Kendrick to sell some of the methamphetamine to Herkelman, although Kendrick admitted that he was neither coerced, threatened nor forced into selling the methamphetamine. He further testified that he did not sell methamphetamine to anyone but Jen and Herkelman and that he did not share the drugs with anyone. Finally, Kendrick testified that he was able to discuss prices with Herkelman because he had dealt with drugs in the past, although he later contradicted this testimony.

Prior to trial, Kendrick requested an entrapment instruction. After hearing evidence of the alleged entrapment, the district court denied Kendrick's request for the jury instruction and held that Kendrick had failed to produce any evidence that, prior to contact with Jen, he "did not have any intent or disposition to commit the crimes charged and was induced or persuaded by Jen, the confidential informant, to commit the crimes." Kendrick then filed an Objection to Jury Instructions and Motion for Entrapment Instruction, which the district court denied after hearing arguments. After a jury found him guilty on all four counts, Kendrick renewed his objection to the omission of an entrapment instruction in a Motion for New Trial and Renewed Rule 29 Motion. The district court denied the motion because Kendrick "failed to present any evidence he was induced or coerced by Jen to sell the methamphetamine."

Kendrick was sentenced on September 2, 2004. The district court found that he had two prior convictions for crimes of violence for the California offense of first degree burglary, in violation of Cal. Penal Code § 459, and the Oregon offense of felony fleeing or attempting to elude a police officer, in violation of O.R.S. §

-4-

811.540. Accordingly, Kendrick was sentenced under the career offender provision of the U.S. Sentencing Guidelines Manual § 4B1.1. Based on an offense level of 34, a criminal history category of VI and a resulting guidelines range of 262 to 327 months, the district court sentenced Kendrick to 262 months' imprisonment. The district court then imposed an alternative sentence of 262 months' imprisonment based on its discretion after considering the factors set forth in 18 U.S.C. § 3553(a).

On appeal, Kendrick argues that the district court abused its discretion by failing to include an entrapment instruction. Kendrick also challenges his classification as a career offender, arguing that the district court erroneously held that the Oregon offense of felony fleeing is a crime of violence as defined by U.S.S.G. § 4B1.2. He also argues that the district court violated the Sixth Amendment when it found that his prior conviction for felony fleeing constituted a crime of violence. Finally, Kendrick argues that the district court clearly erred by failing to grant a two-level acceptance-of-responsibility reduction.

## II. DISCUSSION

### A. Entrapment

"Entrapment exists 'where the evidence establishes that the government agent originated the criminal design, the agent implanted in the mind of an innocent person the disposition to commit the offense, and the defendant then committed the criminal act at the urging of the government agent.'" *United States v. Williams*, 109 F.3d 502, 508 (8th Cir. 1997) (quoting *United States v. Hulett*, 22 F.3d 779, 781 (8th Cir. 1994)). As an affirmative defense, entrapment is a question of fact generally left to the jury. *United States v. Coleman*, 284 F.3d 892, 894 (8th Cir. 2002). A defendant alleging entrapment, however, is not entitled to an entrapment instruction unless "sufficient evidence exists from which a reasonable jury could find entrapment." *United States v. Neal*, 990 F.2d 355, 357 (8th Cir. 1993). This requires a defendant

to show "that the government agents implanted the criminal design in [his] mind[] and induced [him] to commit the offense." *United States v. Cannon*, 88 F.3d 1495, 1504 (8th Cir. 1996). If a defendant can produce sufficient evidence of inducement, then the burden shifts to the prosecution to prove beyond a reasonable doubt that the defendant was predisposed to commit the crime. *United States v. Berg*, 178 F.3d 976, 980 (8th Cir. 1999); *see also United States v. Eldeeb*, 20 F.3d 841, 843 (8th Cir. 1994) ("It is clear that when entrapment is an issue, the government must prove the absence of entrapment beyond a reasonable doubt."). "If the defendant exhibits any predisposition to engage in the criminal conduct, the district court need not instruct the jury on entrapment." *Id.* We review the district court's decision to deny an entrapment instruction for an abuse of discretion. *Williams*, 109 F.3d at 508.

The evidence presented at trial strongly indicates both that the Government did not induce Kendrick's criminal activity and that Kendrick had a predisposition to engage in drug distribution activities. Kendrick admitted that the confidential informant did not coerce, threaten or otherwise force him to sell methamphetamine. Further, Jen neither tempted Kendrick with the promise of financial reward nor attempted to engage him in a personal relationship. Indeed, it was Kendrick who initially sought the confidential informant's assistance in selling some of the methamphetamine he had received from Reyes. At most, the confidential informant facilitated Kendrick's criminal plan by introducing him to Herkelman, an apparent customer. *See United States v. Jensen*, 69 F.3d 906, 909-10 (8th Cir. 1995) (noting an entrapment instruction is not warranted where the Government merely facilitated the defendant's crime). Otherwise, the confidential informant was not involved in any of  the three controlled buys that resulted in Kendrick's convictions.

The evidence at trial showed that, even before Jen introduced him to Herkelman, Kendrick admitted to Harms that he was selling small quantities of methamphetamine to people in his trailer court. *See United States v. Haire*, 103 F.3d 697, 699 (8th Cir. 1996) ("Prior distribution of illegal drugs, even as a gift,

constitutes predisposition."). Further, it was Kendrick's idea, not Jen's, to distribute the methamphetamine he had obtained from Reyes. After he had sold the methamphetamine he had obtained from the sale of his Firebird, Kendrick continued to sell methamphetamine obtained from Harms. Kendrick's assertion that he was merely a drug user[2] and not a drug dealer is belied by his familiarity with the business of selling methamphetamine. *See Jensen*, 69 F.3d at 911(denying entrapment as a matter of law where the defendant made previous sales and gave advice on drug transactions). The district court properly concluded that Jen's involvement merely afforded Kendrick the opportunity to commit an offense for which he was predisposed. *Jacobson v. United States*, 503 U.S. 540, 550 (1992) ("Had the agents in this case simply offered petitioner the opportunity to [commit the crime], and petitioner . . . had promptly availed himself of this criminal opportunity, it is unlikely that his entrapment defense would have warranted a jury instruction."). For these reasons, the district court did not abuse its discretion in denying Kendrick a jury instruction on entrapment.

## B.      Crime of Violence

"A defendant is a career offender if . . . the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense [and] the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 4B1.1(a) (2003). The first predicate crime of violence relied upon by the district court, first degree burglary in violation of Cal. Penal Code § 459, is not in dispute. However, Kendrick challenges the district court's categorization of the Oregon offense of felony fleeing as a crime of violence.

---

[2]Kendrick admitted at trial that he had sustained a prior controlled substance conviction only three years before selling drugs to Herkelman. While not enough by itself to establish predisposition, it is probative of Kendrick's intent to sell drugs. *See United States v. Brooks*, 215 F.3d 842, 846-47 (8th Cir. 2000).

A prior conviction may qualify as a crime of violence if it is an "offense under federal or state law, punishable by imprisonment for a term exceeding one year, that . . . involves conduct that presents a serious potential risk of physical injury to another." U.S.S.G. § 4B1.2. The determination of whether an offense is a crime of violence requires a "categorical approach" that limits the court's inquiry to such sources as "the charging document, the terms of a plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or to some comparable judicial record of this information." *Shepard v. United States*, 125 S. Ct. 1254, 1263 (2005); *Taylor v. United States*, 495 U.S. 575, 602 (1990). We review de novo the district court's holding that felony fleeing is a crime of violence. *United States v. Griffith*, 301 F.3d 880, 884 (8th Cir. 2002); *see also United States v. Sumlin*, 147 F.3d 763, 765 (8th Cir. 1998) ("We review the question of whether a prior offense constitutes a violent felony de novo.").

A person commits the crime of fleeing or attempting to elude a police officer if, while operating a motor vehicle, he knowingly flees or attempts to elude an identifiable police officer after the officer has just given a visual or audible signal to stop. O.R.S. § 811.540. The conduct associated with the commission of felony fleeing calls to mind the risks associated with escape and automobile theft. In *United States v. Nation*, 243 F.3d 467 (8th Cir. 2001), we recognized that every escape, even the most peaceable escape, "'is a powder keg, which may or may not explode into violence and result in physical injury to someone at any given time, but which always has the serious potential to do so.'" *Id.* at 472 (quoting *United States v. Gosling*, 39 F.3d 1140, 1142 (10th Cir. 1994)). This is because "an escapee is likely to possess a 'variety of super-charged emotions, and in evading those trying to recapture him, may feel threatened by police officers, ordinary citizens, or even fellow escapees.'" *Id.* (quoting *Gosling*, 39 F.3d at 1142). There is little doubt that felony fleeing involves, at the very least, the same risks of physical injury to another as a walk-away escape.

-8-

In reality, the dangerous circumstances surrounding a person's attempt to flee from law enforcement are compounded by the person's operation of a motor vehicle. The desperate situation that a person fleeing from law enforcement may find himself in is, in many ways, reminiscent of the serious potential risk of injury surrounding an automobile theft. As a person is in flight from custody, his vehicle has the potential to become a deadly or dangerous weapon. *United States v. Sun Bear*, 307 F.3d 747, 753 (8th Cir. 2002). Further, "[u]nder the stress and urgency which will naturally attend his situation, [a person fleeing from law enforcement] will likely drive recklessly and turn any pursuit into a high-speed chase with the potential for serious harm to police or innocent bystanders." *Id.* Considering the combined risks associated with felony fleeing, we conclude that the district court properly held that O.R.S. § 811.540 is a crime of violence as defined by § 4B1.2. *See United States v. Rosas*, 410 F.3d 332, 334 (7th Cir. 2005) (per curiam) ("[T]he Wisconsin statute at issue, fleeing a police officer is categorically a crime of violence."); *United States v. Martin*, 378 F.3d 578, 582 (6th Cir. 2004) (holding that third-degree fleeing or eluding is a crime of violence because of the risk of injury to pedestrians, other drivers and pursuing officers created by a person fleeing in an automobile); *see also United States v. Albritton*, 135 Fed. Appx. 239, 243 (11th Cir. 2005) (unpublished per curiam) (affirming district court's holding that aggravated fleeing and eluding is a crime of violence).

Kendrick also argues that the district court violated the Sixth Amendment when it found facts necessary to categorize felony fleeing as a crime of violence. As an initial matter, Kendrick admitted at trial to prior convictions for first degree burglary and felony fleeing. *United States v. Booker*, 125 S. Ct. 738, 756 (2005) ("Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be *admitted by the defendant* or proved to a jury beyond a reasonable doubt." (emphasis added)). Regardless, we have consistently rejected the applicability of *Booker* to the fact of a prior conviction, *see, e.g.*, *United States v. Paz*, 411 F.3d 906,

909 (8th Cir. 2005), and to the legal determination of whether a prior conviction may be categorized as a crime of violence, *see, e.g.*, *United States v. Johnson*, 411 F.3d 928, 931-32 (8th Cir. 2005). Indeed, in both *Booker* and *Shepard*, the Supreme Court reaffirmed the authority of the sentencing court to take notice of a defendant's criminal history and, as a matter of law, determine whether any prior conviction is properly categorized as a crime of violence. *See United States v. Marcussen*, 403 F.3d 982, 984 (8th Cir. 2005). Accordingly, the district court properly held that Kendrick's prior conviction for felony fleeing constitutes a crime of violence.

## C.    Acceptance of Responsibility

A defendant who clearly demonstrates acceptance of responsibility for his offense may be entitled to a two-level reduction in his offense level. U.S.S.G. § 3E1.1(a). However, a reduction is not appropriate if the Government goes through the burden of proving its case at trial, unless the defendant was merely ascertaining the viability of an issue unrelated to his guilt, such as a constitutional challenge to a statute. U.S.S.G. § 3E1.1, cmt. n.2. A defendant asserting an entrapment defense is not entitled to a reduction under § 3E1.1 because such a defense "clearly shows that he did not accept responsibility for the crime of conviction." *United States v. Chevre*, 146 F.3d 622, 625 (8th Cir. 1998). Therefore, the district court did not abuse its discretion by denying Kendrick a two-level reduction for his belated acceptance of responsibility. *See United States v. Water*, 413 F.3d 812, 819 (8th Cir. 2005).[3]

---

[3]At the time of his appeal, Kendrick did not have the benefit of the Supreme Court's opinion in *Booker* nor did he ask for supplemental briefing after *Booker*. We now know that the district court's reliance on mandatory guidelines was error. However, in Kendrick's case, the application of mandatory guidelines was harmless in light of the district court's alternative discretionary sentence based on the factors of § 3553(a). *United States v. Bassett*, 406 F.3d 526, 527 (8th Cir. 2005) (per curiam).

## III. CONCLUSION

For the foregoing reasons, we affirm Kendrick's conviction and sentence.

_____