# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-2618

_____

United States of America,

        Appellee,

v.

Shain Malloy,

        Appellant.

\*
\*
\*
\*
\*
\*
\*
\*
\*
\*

_____

No. 09-2619

_____

Appeals from the United States
District Court for the
Northern District of Iowa.

United States of America,

        Appellee,

v.

Michael James Kluge,

        Appellant.

\*
\*
\*
\*
\*
\*
\*
\*
\*
\*

_____

Submitted: April 16, 2010
Filed: August 6, 2010

_____

Before WOLLMAN, MURPHY, and SHEPHERD, Circuit Judges.
_____

SHEPHERD, Circuit Judge.

Shain Malloy pled guilty to, and Michael Kluge was convicted of, conspiring to manufacture 50 grams or more of actual methamphetamine, in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(A), 846, and 851. The district court[1] sentenced Malloy to 188 months imprisonment and Kluge to 360 months imprisonment. Malloy appeals his sentence, and Kluge appeals both his conviction and sentence. We affirm.

I.

Malloy and Kluge were each involved in a methamphetamine-manufacturing conspiracy in and around Sioux City, Iowa, which resulted in the indictment of 23 individuals. Malloy and Kluge were part of a network of individuals who provided raw materials, in the form of pseudoephedrine pills, to the conspiracy's leader, Tony Grenier, in exchange for money and finished methamphetamine.

In January 2009, Malloy pled guilty to one count of conspiring to manufacture 50 grams or more of actual methamphetamine, in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(A), 846, and 851. Malloy's Presentence Investigation Report (PSR) identified three prior Iowa convictions—a 1995 conviction for extortion, a 1995 conviction for burglary, and a 2004 conviction for interference with official acts causing bodily injury—any two of which would qualify Malloy as a career offender under the Sentencing Guidelines. See United States Sentencing Commission, Guidelines Manual, §4B1.1 (Nov. 2009). This increased Malloy's offense level to 32, see id. §4B1.1(b), which was reduced 3 levels due to his acceptance of responsibility,

_____

[1]The Honorable Linda R. Reade, Chief Judge, United States District Court for the Northern District of Iowa.

-2-

see id. §3E1.1(a)-(b). The PSR also found that Malloy had 26 criminal history points. Malloy objected to the career offender enhancement, arguing that his extortion and interference with official acts convictions did not qualify as predicate offenses under §4B1.1. The district court found that both convictions qualified Malloy for the career offender enhancement.[2] With an offense level of 29 and a criminal history Category VI, Malloy's advisory Guidelines sentencing range was 151-188 months imprisonment, and the district court sentenced Malloy at the top of that range, 188 months imprisonment.

Kluge proceeded to trial in February 2009. The government's first witness was John Howard, a special agent with the Drug Enforcement Administration (DEA) Tri-State Drug Task Force in Sioux City, Iowa. Special Agent Howard had investigated the conspiracy and testified about Kluge's frequent purchases of pseudoephedrine pills from pharmacies in Sioux City, based on those pharmacies' pill logs. According to Special Agent Howard, based on his training and experience, none of the pseudoephedrine pills purchased by Kluge were for his legitimate use.

Grenier testified about the process he used in making methamphetamine and about the network of individuals, including Kluge, who brought him pseudoephedrine pills in exchange for money and finished methamphetamine. According to Grenier, all of the individuals who brought him pseudoephedrine pills knew that the pills were being used to manufacture methamphetamine. Seven other coconspirators also testified about their roles in the conspiracy and about Kluge's role in obtaining

---

[2]At the sentencing hearing, the district court noted: "Based on my reading of this [PSR] . . . if I find [Malloy] is not a career offender, I probably am going to depart upward substantially for understatement of criminal history and likelihood of recidivism and his dangerousness." (Sentencing Hr'g Tr. 6, June 8, 2009.) The court also indicated that, even if Malloy was a career offender, it was considering departing upward from the career offender guideline based on Malloy's extensive criminal background and history of assaults, primarily against women. (See id. at 7, 29-30.)

pseudoephedrine for Grenier. According to the coconspirators' and Grenier's testimony, Kluge gave pseudoephedrine pills directly to Grenier and also funneled pills to Grenier through other coconspirators. Kluge chose not to present evidence in his defense.

The jury convicted Kluge of conspiring to manufacture 50 grams or more of actual methamphetamine, in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(A), 846, and 851. Following trial, Kluge's attorney filed timely motions for judgment of acquittal and for a new trial, which the district court denied without prejudice on procedural grounds.[3] Shortly thereafter, the district court granted Kluge's pro se motion to dismiss his attorney and represent himself. Kluge then filed a motion for judgment of acquittal and motion for new trial, which the district court denied. Kluge's PSR identified two prior Iowa convictions that qualified Kluge for an enhanced sentence under §4B1.1—a 1998 conviction for burglary and a 2002 conviction for eluding. This raised Kluge's offense level to 37, which, coupled with a criminal history Category VI, resulted in an advisory Guidelines sentencing range of 360 months to life imprisonment.

Kluge represented himself at his sentencing hearing. He first withdrew his previous objection to the drug quantity attributed to him in the PSR. Kluge also made a number of sentencing arguments, including that: (1) his prior convictions did not qualify him for the career offender enhancement, see USSG §4B1.1; (2) he should not receive the obstruction of justice enhancement sought by the government,[4] see id. §3C1.1; (3) he was entitled to a reduction in his sentence for his role in the offense, see id. §3B1.2; and (4) the court should vary from the Guidelines sentencing range.

---

[3]The motions failed to comply with Local Rules 47.a and 7.d, which require the moving party to file a brief contemporaneously with any motion.

[4]The government sought the enhancement based on allegations that, while awaiting sentencing, Kluge made threats against a cooperating witness.

-4-

The district court found that Kluge's burglary and eluding convictions were both crimes of violence under §4B1.1, subjecting him to the career offender enhancement. Because Kluge's sentence would be determined under the career offender guidelines, the district court declined to rule on (1) the obstruction of justice enhancement and (2) the role in the offense reduction. The court also declined to vary from the Guidelines, sentencing Kluge to 360 months imprisonment.

## II.

### A.

Malloy appeals his sentence, arguing that his convictions for extortion and interference with official acts causing bodily injury do not qualify as crimes of violence for purposes of the career offender enhancement.[5] Malloy also argues that the district court erred by failing to determine what his Guidelines sentencing range would have been, had the career offender enhancement not applied. We review de novo the question of whether a prior offense is a crime of violence under §4B1.1. See United States v. Aleman, 548 F.3d 1158, 1168 (8th Cir. 2008), cert. denied, 129 S. Ct. 2756 (2009).

The Sentencing Guidelines provide for enhanced sentences for certain recidivists. This is embodied in §4B1.1, which states that a defendant is a "career offender" if:

> (1) the defendant was at least eighteen years old at the time [he] committed the instant offense of conviction; (2) the instant offense of

---

[5]Because Malloy does not challenge the district court's determination that his 1995 burglary conviction qualifies as a crime of violence, we will uphold his sentence if either of his other two convictions also qualify as a crime of violence. See USSG §4B1.1(a).

conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

USSG §4B1.1(a). A "crime of violence" is defined as "any felony offense that either '(1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or (2) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.'" Aleman, 548 F.3d at 1168 (quoting USSG §4B1.2(a)).

In determining whether an offense constitutes a crime of violence, "we focus on the generic elements of the offense and not on the specific facts underlying [the] conviction." United States v. Gordon, 557 F.3d 623, 625 (8th Cir. 2009) (citing Begay v. United States, 553 U.S. 137, 141 (2008)). Malloy was convicted under Iowa's extortion statute, Iowa Code § 711.4, which criminalizes any of the following actions if they are done "with the purpose of obtaining for oneself or another anything of value, tangible or intangible, including labor or services":

1. Threaten[ing] to inflict physical injury on some person, or to commit any public offense.
2. Threaten[ing] to accuse another of a public offense.
3. Threaten[ing] to expose any person to hatred, contempt, or ridicule.
4. Threaten[ing] to harm the credit or business or professional reputation of any person.
5. Threaten[ing] to take or withhold action as a public officer or employee, or to cause some public official or employee to take or withhold action.
6. Threaten[ing] to testify or provide information or to withhold testimony or information with respect to another's legal claim or defense.
7. Threaten[ing] to wrongfully injure the property of another.

Iowa Code § 711.4. Because section 711.4 sets forth distinct offenses with different elements, it is necessary to look beyond the statutory definition. Under this "modified categorical approach," our examination "is limited to . . . the charging document, the terms of a plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or to some comparable judicial record of this information." Shepard v. United States, 544 U.S. 13, 26 (2005). The trial information and criminal judgment establish that Malloy was convicted under subsection 7, for "[t]hreaten[ing] to wrongfully injure the property of another." Iowa Code § 711.4(7). It is a question of first impression whether this crime qualifies as a crime of violence under §4B1.1. In deciding this issue, we are guided both by cases analyzing §4B1.1, as well as cases interpreting whether an offense is a "violent felony" under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e). See United States v. Williams, 537 F.3d 969, 971 (8th Cir. 2008).

Immediately, Malloy's argument encounters a significant hurdle: extortion is specifically listed as a crime of violence in §4B1.2(a)(2). Although we cannot rely solely on the label given to a particular crime when deciding whether it qualifies as a crime of violence, see Taylor v. United States, 495 U.S. 575, 590-92 (1990), "[a] defendant who seeks to exclude a specifically enumerated offense from the sweep of section 4B1.2 must shoulder a heavy burden of persuasion[,]" United States v. DeLuca, 17 F.3d 6, 8 (1st Cir. 1994). Malloy attempts to meet this burden by arguing that, because his extortion conviction does not involve threats against the person of another, but rather only against property, it is not a crime of violence. In essence, Malloy argues that "extortion," as that word is used in the Guidelines, encompasses only threats that involve bodily, and not pecuniary, harm. To support his claim, Malloy relies heavily on United States v. Anderson, 989 F.2d 310 (9th Cir. 1993). In Anderson, the defendant pled guilty to being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g), and his sentence was enhanced under the ACCA due to his three previous convictions for violent felonies. Id. at 311. One of these prior convictions was for attempted extortion, in violation of Washington Revised Code

-7-

section 9A.56.130.[6]  On appeal, the Ninth Circuit adopted the definition of extortion found in the Hobbs Act,[7] 18 U.S.C. § 1951, and held that, because the defendant only *attempted* to obtain property, his crime did not fit that definition and was not extortion under § 924(e).  Anderson, 989 F.2d at 313.

Like the district court, we are unpersuaded by Anderson and find the First Circuit's discussion in DeLuca more compelling.  In DeLuca, the defendant argued that his state extortion conviction[8] was not a crime of violence under §4B1.2.  See 17 F.3d at 8.  The First Circuit rejected that argument, noting that nothing in the Guidelines, which specifically list extortion as a crime of violence, states or implies that extortion must involve threats to harm the person of another.  Id.  The court saw "no sound reason for looking to the Hobbs Act to borrow a definition of a fairly well understood term."  Id. at 9.  Even if the Hobbs Act definition were used, the court

---

[6]Washington defines extortion as "knowingly . . . obtain[ing] or attempt[ing] to obtain by threat property or services."  Wash. Rev. Code § 9A.56.110.

[7]The Hobbs Act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  18 U.S.C. § 1951(b)(2).

[8]The defendant was convicted of extortion in Rhode Island, under a statute which states, in pertinent part:

> Whoever, verbally or by a written or printed communication, maliciously threatens to accuse another of a crime or offense or by a verbal or written communication maliciously threatens any injury to the person, reputation, property, or financial condition of another, or threatens to engage in other criminal conduct with intent to extort money or any unlawful pecuniary advantage, or with intent to compel any person to do any act against his or her will, or to prohibit any person from carrying out a duty imposed by law, shall be punished [as provided by law].

R.I. Gen. Laws § 11-42-2.

"believe[d] the 'fear' element . . . can be satisfied by threats other than threats of bodily harm, say, by putting the victim in fear of economic harm." Id. Additionally, the court noted that restricting "extortion" in §4B1.2(a)(2) to include only threats of physical harm would render the guideline redundant, as the Guidelines make "*any* crime that has as an element the threatened use of physical force against the person of another a crime of violence." DeLuca, 17 F.3d at 10 (quotation and alteration omitted). Finally, the court distinguished Anderson, noting that "it does not matter whether one calls the crime of which appellant stands convicted 'extortion' or 'attempted extortion,'" id., because "[t]he term[] 'crime of violence' . . . include[s] the offenses of aiding and abetting, conspiring, and *attempting* to commit [an] offense[]," id. (quoting USSG §4B1.2, comment. (n.1)).

Like the DeLuca court, we see no reason to read §4B1.2 so narrowly as to exclude extortion that threatened only property. To do so would render §4B1.2(a)(1) redundant, an outcome we must seek to avoid. See id. at 10; United States v. Arnaout, 431 F.3d 994, 1001 (7th Cir. 2005) ("The Guidelines must be interpreted, however, so no words are discarded as meaningless, redundant or surplusage."). Thus, we hold that Malloy's extortion conviction under Iowa Code section 711.4(7) qualifies as a crime of violence under §4B1.1.[9]

---

[9]Malloy also argues that Chambers v. United States, 129 S. Ct. 687 (2009), supports his position that not all extortion convictions qualify as crimes of violence. In Chambers, the Supreme Court held that the crime of failing to report for penal confinement did not qualify as a violent felony under the ACCA. Id. at 691-93. In doing so, the Court noted that failing to report was "a far cry from the purposeful, violent, and aggressive conduct potentially at issue when an offender uses explosives against property, commits arson, burgles a dwelling or residence, or engages in certain forms of extortion." Id. at 692 (quotations omitted). Cf. James v. United States, 550 U.S. 192, 220-24 (2007) (Scalia, J., dissenting) (noting that the definition of extortion has expanded beyond the crime's common-law definition and arguing that the term, for purposes of the ACCA, should be restricted to "the obtaining of something of value from another, with his consent, induced by the wrongful use or threatened use of force against the person or property of another"). According to Malloy, the fact

B.

In the alternative, we hold that Malloy's conviction for interference with official acts causing bodily injury is a crime of violence under §4B1.1. The trial information and criminal judgment, which the district court properly consulted under the "modified categorical approach," see Shepard, 544 U.S. at 26, stated that Malloy was convicted under Iowa Code section 719.1, which reads, in pertinent part:

> A person who knowingly resists or obstructs anyone known by the person to be a peace officer, . . . in the performance of any act which is within the scope of the lawful duty or authority of that officer, . . . or who knowingly resists or obstructs the service or execution by any authorized person of any civil or criminal process or order of any court, commits a simple misdemeanor. . . . However, if a person commits an interference with official acts, as defined in this subsection, and in so doing inflicts bodily injury other than serious injury, that person commits an aggravated misdemeanor.

Iowa Code § 719.1(1). Because an aggravated misdemeanor under Iowa law carries the possibility of a two-year prison sentence, see Iowa Code § 903.1(2), it qualifies as a "prior felony conviction" for purposes of §4B1.1, see USSG §4B1.2, comment. (n.1). See United States v. Postley, 449 F.3d 831, 832 (8th Cir. 2006) (holding that an aggravated misdemeanor conviction under section 719.1 is a felony for purposes of assessing criminal history points under USSG §4A1.2(c)). To convict Malloy under section 719.1(1), a jury must have found that: (1) Malloy knowingly resisted or obstructed a person, (2) he knew to be a peace officer, (3) in the performance of an act

that Chambers noted that only "certain forms of extortion" were violent means that extortion that threatens property is not a crime of violence. Without more guidance from the Court as to which "forms of extortion" it believes are "purposeful, violent, and aggressive," Chambers, 129 S. Ct. at 692, we decline to read into the Court's comment a requirement that extortion threaten the person of another in order to qualify as a crime of violence.

within the scope of that officer's lawful duty, and (4) in doing so, inflicted bodily injury other than serious injury. See Iowa Code § 719.1(1); State v. Jennings, No. 09-0490, 2010 WL 1879547, at *2 n.1 (Iowa Ct. App. May 12, 2010).

Based on this final element, that the defendant "inflicted bodily injury," the district court held that a violation of section 719.1(1) "has as an element the use, attempted use, or threatened use of physical force against the person of another," such that it qualifies as a crime of violence. USSG §4B1.2(a)(1). Malloy disputes this, arguing that a conviction under section 719.1(1) need not, necessarily, involve force. For example, according to Malloy, if a police officer, in attempting to catch a fleeing suspect on foot, falls down and bruises his knee, the suspect could be convicted under section 719.1(1). This evinces Malloy's misunderstanding of the statute. By its terms, the statute requires that the defendant "inflict[]" the injury upon the peace officer. Iowa Code § 719.1(1). "Inflict" means "[t]o cause or carry out by aggressive action, as physical assault." Webster's II New College Dictionary 568 (2001); see also 7 Oxford English Dictionary 938 (2d ed. 1989) (defining inflict as "[t]o lay on as a stroke, blow or wound; to impose as something that must be suffered or endured; to cause to be borne"). Under Malloy's hypothetical situation, it cannot be said that the fleeing defendant "caused" the chasing officer to fall or "carried out" the fall "by aggressive action." Thus, such a defendant could not be convicted under section 719.1(1). Like the district court, we find it "difficult, if not impossible, to imagine how the charged conduct could be carried out without actually using physical force against the person of another." United States v. Malloy, No. 08-CR-4060, 2009 WL 1849820, at *7 (N.D. Iowa June 25, 2009) (unpublished). This is consistent with the way Iowa courts have applied section 719.1(1) to cover only "active interference." State v. Smithson, 594 N.W.2d 1, 2 (Iowa 1999); see, e.g., State v. Hebeler, No. 00-0377, 2001 WL 736025, at *2, 6-9 (Iowa Ct. App. June 13, 2001) (unpublished) (affirming interference conviction for defendant who bit an officer during arrest). Accordingly, we hold that Malloy's conviction for interference with official acts causing bodily injury is a crime of violence under §4B1.2(a)(1).

In sum, we hold that both Malloy's conviction for extortion and his conviction for interference with official acts causing bodily injury qualify as crimes of violence, as that term is defined in §4B1.2(a). As such, because Malloy had at least two prior felony convictions for crimes of violence and otherwise meets the definition of a career offender under §4B1.1(a), the district court properly found Malloy to be a career offender and calculated his advisory Guidelines sentence under §4B1.1(b).[10]

III.

A.

Kluge appeals the district court's denial of his motion for acquittal, arguing that the evidence was insufficient to support his conviction. We review the denial of a motion for judgment of acquittal de novo. United States v. Thomas, 565 F.3d 438, 441 (8th Cir.), cert. denied, 130 S. Ct. 435 (2009). In doing so, we "view[] the evidence in the light most favorable to the government, resolving evidentiary conflicts in favor of the government, and accepting all reasonable inferences drawn from the evidence that support the jury's verdict." Id. "We will uphold the verdict if there is any interpretation of the evidence that could lead a reasonable-minded jury to find the defendant guilty beyond a reasonable doubt." United States v. Nolen, 536 F.3d 834, 842 (8th Cir. 2008) (quotation and alteration omitted). This "very strict" standard allows us to reverse a jury "conviction only if we conclude that no reasonable jury could have found the accused guilty beyond a reasonable doubt. Moreover, in making this determination, we may not weigh the evidence or assess the credibility of witnesses." Id. (quotations and citation omitted). For Kluge to be properly convicted

_____

[10]Because we find that the district court correctly sentenced Malloy as a career offender, we need not reach his argument that the district court erred by failing to state what his alternative sentence would have been, and the reasons for imposing such alternative sentence, had the court incorrectly found Malloy to be a career offender.

of conspiracy to manufacture methamphetamine, the government had to prove that: (1) an agreement to manufacture methamphetamine existed; (2) Kluge voluntarily and intentionally joined in the agreement, either at the outset or later; and (3) at the time he joined the agreement, Kluge knew the purpose of the agreement was to manufacture methamphetamine. See United States v. Turner, 583 F.3d 1062, 1067 (8th Cir. 2009), cert. denied, 130 S. Ct. 1928 (2010).

First, Kluge argues that the witnesses who testified against him at trial were not credible, that their testimony was confusing and contradictory, and that their testimony was not corroborated by independent evidence. None of these arguments are within our scope of review, as we do not weigh the evidence or consider the credibility of witnesses when reviewing the denial of a motion for judgment of acquittal; such questions are for the jury. See, e.g., United States v. Santana, 524 F.3d 851, 853 (8th Cir. 2008); United States v. Carpenter, 422 F.3d 738, 746 (8th Cir. 2005) (noting that caselaw relied on by the defendant "do[es] not hold that witness testimony must be corroborated. Rather, the credibility of witnesses is for the jury to evaluate."); United States v. Kirkie, 261 F.3d 761, 768 (8th Cir. 2001) ("Questions of credibility are the province of the jury. . . . A trial court has neither the duty nor the authority to grant a motion for acquittal based on the credibility of a witness." (quotation omitted)); United States v. Anderson, 78 F.3d 420, 422 (8th Cir. 1996) ("It is not our province on appeal to reweigh the evidence or judge the credibility of witnesses when reviewing the sufficiency of the evidence." (quotation omitted)). While some of the coconspirators' testimony may have contained minor inconsistencies, it was not so incredible as to require acquittal. See United States v. Crenshaw, 359 F.3d 977, 988 (8th Cir. 2004) ("The test [on appeal] for rejecting evidence as incredible is extraordinarily stringent and is often said to bar reliance only on testimony asserting facts that are physically impossible.").

Second, Kluge argues that the evidence was insufficient as to the quantity of methamphetamine produced. Kluge was convicted of conspiring to manufacture 50

grams or more of actual methamphetamine. See 21 U.S.C. § 841(b)(1)(A)(viii). As a member of a drug conspiracy, Kluge "is responsible for all contraband within the scope of criminal activity jointly undertaken by [him] and reasonably foreseeable to [him]." United States v. Davidson, 195 F.3d 402, 410 (8th Cir. 1999) (quotation omitted). In his plea agreement, Grenier admitted to "involvement in at least 350 grams of actual (pure) methamphetamine." (Appellee's App. 6.) This evidence, combined with the testimony of other coconspirators and the pill logs showing Kluge's purchases of pseudoephedrine, was sufficient to allow a reasonable jury to find that Kluge voluntarily and intentionally joined a conspiracy to manufacture at least 50 grams of actual methamphetamine, and that Kluge knew of the purpose of the conspiracy when he joined. See Turner, 583 F.3d at 1067. Thus, we affirm the district court's denial of Kluge's motion for judgment of acquittal.

B.

Kluge also appeals the district court's denial of his motion for new trial. Kluge argues that the district court (1) erred in finding that the motion was untimely, and (2) should have granted the motion to avoid a miscarriage of justice. When ruling on a motion for new trial:

> If the [district] court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury. This authority should be exercised sparingly and with caution; nevertheless, the trial court has wide discretion in deciding whether to grant a new trial in the interest of justice. Corresponding to the district court's broad discretion is the limited scope of our review: we will reverse the district court's ruling on the motion for new trial only if we find that ruling to be a clear and manifest abuse of discretion.

-14-

United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980). A miscarriage of justice occurs when the verdict "is against the great weight of the evidence." Boesing v. Spiess, 540 F.3d 886, 890 (8th Cir. 2008).

First, we can easily dispense with Kluge's argument that the district court erred in finding that his motion was untimely filed. Although the district court correctly noted that Kluge's motion was filed three days after the deadline set by the court, the court went on to rule on the merits of Kluge's motion. Thus, any alleged error by the district court was harmless. Second, having reviewed the record, we hold that the district court did not abuse its discretion in refusing to grant Kluge a new trial on the ground that the verdict was against the weight of the evidence. On the contrary, our reading of the record convinces us that the evidence weighs heavily in favor of the verdict, not against it. Thus, we affirm the district court's denial of Kluge's motion for new trial.

## IV.

Kluge appeals his sentence, arguing that the district court erred in finding that he qualified as a career offender under §4B1.1. Kluge does not challenge the district court's determination that his 1998 burglary offense is a crime of violence, but argues that his 2002 eluding conviction is not a crime of violence. Our review is de novo. See Aleman, 548 F.3d at 1168.

Kluge pled guilty to eluding or attempting to elude a pursuing law enforcement officer, under Iowa Code section 321.279, which states:

> The driver of a motor vehicle commits a class "D" felony if the driver willfully fails to bring the motor vehicle to a stop or otherwise eludes or attempts to elude a marked official law enforcement vehicle that is driven by a uniformed peace officer after being given a visual and audible signal as provided in this section, and in doing so exceeds the

-15-

speed limit by twenty-five miles per hour or more, and if any of the following occurs:

     a.  The driver is participating in a public offense, as defined in section 702.13, that is a felony.

     b.  The driver is in violation of section 321J.2 or 124.401.

     c.  The offense results in bodily injury to a person other than the driver.

Iowa Code § 321.279(3). The trial information, which was properly before the district court under the "modified categorical approach," see Shepard, 544 U.S. at 26, stated that Kluge was charged under section 321.279(3)(b), eluding an officer while in violation of section 124.401(5) (possession of methamphetamine). It is a question of first impression whether eluding under section 321.279(3) constitutes a crime of violence.

In holding that eluding under section 321.279(3) was a crime of violence, the district court analyzed the offense under the "otherwise" clause of §4B1.2(a)(2), which provides that offenses other than the example crimes—burglary of a dwelling, arson, extortion, and crimes involving explosives—can be crimes of violence if they "otherwise involve[] conduct that presents a serious potential risk of physical injury to another." Prior to Begay and Chambers, we analyzed offenses under the "otherwise" clause "by determining whether the elements of the prior offense involve conduct that necessarily presents a serious potential risk of physical injury to another." United States v. Hudson, 577 F.3d 883, 884-85 (8th Cir. 2009), cert. denied, 130 S. Ct. 1310 (2010) (quotation omitted). Using this standard, we held that fleeing under Oregon law was a crime of violence under §4B1.2, focusing on "the dangerous circumstances surrounding a person's attempt to flee from law enforcement [which] are compounded by the person's operation of a motor vehicle." United States v. Kendrick, 423 F.3d 803, 809 (8th Cir. 2005).

Begay and Chambers "altered the test for determining a crime of violence" under the "otherwise" clause. Hudson, 577 F.3d at 885. Following those cases, for

an offense "to fall within the 'otherwise' clause it must pose a similar degree of risk of physical injury as the example crimes and be similar in kind to the example crimes." Williams, 537 F.3d at 972 (citing Begay, 553 U.S. at 142-44). "For a crime to be similar in kind to the example crimes, it should typically involve 'purposeful, violent, and aggressive conduct.'" Id. (quoting Begay, 128 S. Ct. at 145). The Begay Court held that the strict-liability crime of driving under the influence was not a violent felony under the ACCA, as it was "simply too unlike" the example crimes. Begay, 553 U.S. at 142.

Following Begay and Chambers, our sister circuits have split on the question of whether fleeing a police officer in a motor vehicle constitutes a "crime of violence" or "violent felony." Compare United States v. Rivers, 595 F.3d 558 (4th Cir. 2010) (South Carolina's failure to stop for a blue light offense not a violent felony), and United States v. Harrison, 558 F.3d 1280, 1290-96 (11th Cir. 2009) (Florida's fleeing offense not a violent felony), with United States v. McConnell, 605 F.3d 822, 826-30 (10th Cir. 2010) (Kansas's fleeing or eluding offense is a crime of violence), United States v. Harrimon, 568 F.3d 531, 533-37 (5th Cir.), cert. denied, 130 S. Ct. 1015 (2009) (Texas's fleeing offense is a violent felony), United States v. LaCasse, 567 F.3d 763, 765-67 (6th Cir. 2009), cert. denied, 130 S. Ct. 1311 (2010) (Michigan's fleeing offense is a violent felony), and United States v. Spells, 537 F.3d 743, 749-53 (7th Cir. 2008), cert. denied, 129 S. Ct. 2379 (2009) (Indiana fleeing offense is a violent felony).

We have also split on the question of whether fleeing or eluding is a crime of violence following Begay and Chambers. For example, in Hudson, we held that the Missouri offense of resisting arrest by fleeing in such a manner that created a substantial risk of serious physical injury or death to any person was a crime of violence. 577 F.3d at 885-87; see also United States v. Richardson, 581 F.3d 824, 825 (8th Cir. 2009) (per curiam), cert. denied, 130 S. Ct. 1538 (2010) (holding that the Kansas offense of fleeing or attempting to elude a police officer where the defendant

is involved in a motor vehicle accident or intentionally causes property damage was a crime of violence).

Kluge, however, urges us to follow United States v. Tyler, 580 F.3d 722 (8th Cir. 2009).  In Tyler, the defendant had been classified as a career offender based, in part, on a Minnesota conviction for fleeing a peace officer in a motor vehicle.  Id. at 724.  The Minnesota statute at issue prohibited "flee[ing] or attempt[ing] to flee a peace officer who is acting in the lawful discharge of an official duty," id. (quoting Minn. Stat. § 609.487, subdiv. 3), and defined fleeing as "increas[ing] speed, extinguish[ing] motor vehicle headlights or taillights, refus[ing] to stop the vehicle, or us[ing] other means with intent to attempt to elude a peace officer following a signal given by any peace officer," id. (quoting Minn. Stat. § 609.487, subdiv. 1).  Because "[n]either high speed nor reckless driving [was] a statutory element," we held that "such actions . . . do not necessarily translate into a serious potential risk of physical injury."  Id. at 725.  In holding that fleeing under this statute was not similar in kind to the example crimes of the career offender guideline, we noted that "[t]he common thread running through offenses found to be 'crimes of violence' is that those crimes implicate a propensity in the perpetrator to commit violent acts against others."  Id.  Because "extinguishing one's headlights or taillights to avoid being pulled over by a police officer [does not] impli[y] a propensity to act violently toward others," id., we held that the offense was not similar in kind to the example crimes, and, thus, not a crime of violence, id. at 726.  We also specifically distinguished Kendrick, noting that while it "still stands for the proposition that Oregon's fleeing offense involves conduct that presents a serious risk of physical injury to another, it says nothing about whether the offense typically involves purposeful, violent, and aggressive conduct."  Id. at 726 n.4.

With this caselaw in mind, we must decide (1) whether Iowa's fleeing offense involves conduct that presents a serious risk of physical injury to another, and (2) whether it involves purposeful, violent, and aggressive conduct such that it is similar

in kind to the example crimes in §4B1.2(a)(2). We have little trouble answering the first question in the affirmative. When a person flees from the police at high speed, as Kluge did, "his vehicle has the potential to become a deadly or dangerous weapon." Kendrick, 423 F.3d at 809. As the Fifth Circuit has noted, the risk of injury to others associated with police pursuits of fleeing suspects "appear[s] to be at least 'roughly similar' to that associated with arson," one of the example crimes in §4B1.2(a)(2). Harrimon, 568 F.3d at 537 (quoting Begay, 553 U.S. at 143). Finally, unlike the Minnesota statute at issue in Tyler, Iowa's fleeing statute only applies to those who "exceed[] the speed limit by twenty-five miles per hour or more." Iowa Code § 321.279(3); see Tyler, 580 F.3d at 725 ("Neither high speed nor reckless driving is a statutory element of [Minnesota's fleeing statute]."); see also Harrison, 558 F.3d at 1294 (holding that Florida's fleeing crime does not involve a high level of risk of physical harm to others because "[n]either high speed nor reckless driving is a statutory element"). Thus, we hold that eluding under section 321.279(3) poses a similar degree of risk of physical injury to others as do the example crimes in §4B1.2(a)(2). Cf. Tyler, 580 F.3d at 726 n.4 (noting that Kendrick's holding that "Oregon's fleeing offense involves conduct that presents a serious risk of physical injury to another" survives Begay).

Although it presents a close question, we also believe that eluding under section 321.279(3) is "roughly similar[] in kind" to the example crimes. Begay, 553 U.S. at 143. First, it is clear that section 321.279(3) punishes conduct that is purposeful. Section 321.279(3) applies only to those who "willfully" fail to stop or otherwise elude police officers. This is enough to satisfy Begay's requirement that the conduct be purposeful. See Hudson, 577 F.3d at 886 ("Like three other circuits, we conclude that knowingly fleeing a police officer who is attempting to make an arrest is purposeful conduct that falls within the 'otherwise involves' clause of §4B1.2(a)(2) as construed in Begay."); see also United States v. Dismuke, 593 F.3d 582, 593 (7th Cir. 2010) (noting that "the circuits are in agreement" on the question of whether fleeing is purposeful under Begay).

-19-

Second, we find that the conduct amounting to a violation of section 321.279(3) is "violent . . . and aggressive," Begay, 553 U.S. at 144-45 (quotation omitted), and we resist Kluge's argument that Tyler requires us to hold otherwise. Important to our decision in Tyler was the fact that the Minnesota crime of "fleeing" was defined so broadly as to "criminalize[] conduct that is neither violent nor aggressive, such as merely extinguishing motor vehicle headlights or taillights." 580 F.3d at 725 (quotation and alteration omitted). Section 321.279(3), however, is only violated when one "exceeds the speed limit by twenty-five miles per hour or more." By definition, section 321.279(3) does not criminalize the passive conduct that troubled the Tyler court. Instead, it applies only to those who flee police, at high speed, while simultaneously (1) committing another felony, (2) operating under the influence of drugs or alcohol or possessing a controlled substance, or (3) injuring a person other than the driver. See Iowa Code § 321.279(3)(a)-(c). Such actions are much more aggressive than "merely extinguishing motor vehicle headlights or taillights," Tyler, 580 F.3d at 725 (quotation and alteration omitted), or merely refusing to stop after being instructed to do so, see Harrison, 558 F.3d at 1293; Roseboro, 551 F.3d at 234.

By dramatically exceeding the speed limit, a defendant violating section 321.279(3) increases both the likelihood of an accident and the possible degree of injury stemming from such an accident. "Taking flight," especially at such high speed, "aside from any accompanying risk to pedestrians and other motorists, . . . dares the officer to needlessly endanger himself in pursuit." Spells, 537 F.3d at 752. Such chases "increase the likelihood of serious harm to the officers involved as well as any bystanders that by happenstance get in the way of a fleeing perpetrator or his pursuers." United States v. West, 550 F.3d 952, 970 (10th Cir. 2008). Chases can end with a confrontation, perhaps a violent confrontation, with the pursuing officer. See Hudson, 577 F.3d at 883 ("Resisting arrest by fleeing inevitably invites confrontation, as it calls the officer to give chase . . . ." (quotation omitted)). It is this potential for violence that the Court has identified as the risk associated with burglary, one of §4B1.2(a)(2)'s example crimes. See James v. United States, 550 U.S.

-20-

192, 203 (2007). Far from being passive, a highspeed chase "involves violent force" and "is similar to the behavior underlying an escape from custody, which, as the Supreme Court noted in Chambers, is 'less passive' and 'more aggressive' than that likely underlying failure to report." Harrimon, 568 F.3d at 535 (quoting Chambers, 129 S. Ct. at 691); see also United States v. Furqueron, 605 F.3d 612, 614-16 (8th Cir. 2010) (holding that an escape from custody under Minnesota law is a crime of violence). For these reasons, we hold that eluding under section 321.279(3) is similar in kind to the example crimes listed in §4B1.2(a)(2).

In sum, we hold that the offense of eluding under Iowa Code section 321.279(3) is a crime of violence for purposes of the Sentencing Guidelines, as it is "roughly similar, in kind as well as in degree of risk posed," to the example crimes in §4B1.2(a)(2). See Begay, 553 U.S. at 143. Because Kluge had two prior convictions for crimes of violence, the district court properly sentenced him as a career offender.[11]

V.

For the foregoing reasons, we affirm.

_____

[11]Because we find that Kluge was a career offender, his arguments that the district court erred in (1) denying his request for a role in the offense reduction under USSG §3B1.2, and (2) considering the government's motion for a sentence enhancement due to obstruction of justice under USSG §3C1.1, are moot. See United States v. Beltran, 122 F.3d 1156, 1160 (8th Cir. 1997).