# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-2230

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Southern District of Iowa. |
| Brian Lee Wells, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: February 17, 2011
Filed: July 26, 2011

_____

Before SMITH, GRUENDER, and BENTON, Circuit Judges.

_____

SMITH, Circuit Judge.

A jury found Brian Wells guilty of conspiring to manufacture methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 846, and 841(b)(1)(A), and the district court[1] subsequently sentenced Wells to a mandatory-minimum term of life imprisonment. Wells appeals his conviction, contending that (1) the government presented insufficient evidence of his entry into an actual agreement with others to manufacture methamphetamine, (2) the district court committed plain error by

_____

[1]The Honorable John A. Jarvey, United States District Judge for the Southern District of Iowa.

admitting certain evidence, and (3) his trial lawyer rendered ineffective assistance of counsel. For the following reasons, we affirm.

## I. *Background*

On September 10, 2009, a federal grand jury in the Southern District of Iowa returned a one-count indictment charging Jeffrey Scott Wessels ("Jeff"); Jeff Wessels's son, William Andrew Wessels ("Andy"); Stacey Lynn Shanahan, and Wells. Specifically, the indictment charged that, "beginning on a date unknown to the Grand Jury, but beginning no later than during or about the Fall of 2007, and continuing to on or about March 20, 2009," Wells and his codefendants conspired "with each other and with other persons," unnamed and uncharged, to manufacture methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 846, and 841(b)(1)(A).

At trial, the government presented the following evidence of methamphetamine manufacturing at three separate properties in rural Johnson County, Iowa. On March 20, 2009, a joint unit comprised of the Johnson County Drug Task Force and the Iowa State Patrol "tac team" executed a search warrant at 1603 Blains Cemetery Road NW, a rural property located in Swisher, Iowa, northwest of Iowa City ("Swisher House"). Several law-enforcement officers who executed the warrant testified that, at the Swisher House, they uncovered large amounts of "lab trash" and other evidence of methamphetamine manufacturing such as an "off-gassing HCL generator." Indeed, one of the executing officers testified that "[t]here was a lot of manufacturing remnants," and opined that the Swisher House was "probably one of the largest labs that [she had] ever been to."

Nevertheless, no physical evidence linked Wells to the Swisher House or its resident methamphetamine operation. Law enforcement testified that, when they arrived to execute the warrant, they found only Jeff, his son Andy, and two others in a camper and that Wells was not on the property. Moreover, law enforcement conceded that they found "no indicia" that Wells had ever lived at the Swisher House,

worked there, or even frequented there, nor did they observe Wells at the Swisher House during their surveillance of the property two days prior to the search warrant's execution. As one official testified, "[t]hrough the course of the investigation[,] it was determined that Jeff Wessels, Andy Wessels, Stacey Shanahan, and Troy Pritchett were the primary [methamphetamine] cooks on that property." The only trial evidence that placed Wells at the Swisher House was Jeff's testimony that he assisted Wells in manufacturing methamphetamine there "probably three or four times" and that his assistance was limited to "[j]ust providing [Wells] the location and probably g[iving] him anhydrous [ammonia] a couple of times."

On July 21, 2009, four months after raiding the Swisher House, the same task force conducted a consent search at 3181 Half Moon Avenue NW, in Tiffin, Iowa ("Tiffin House"). The task force received information from that property's owner that an individual named Scotty Young ("Young") and another unidentified male were living at the property without permission and possibly manufacturing methamphetamine. In a metal outbuilding situated on the southwestern portion of the Tiffin House property, law enforcement found evidence of methamphetamine manufacturing. Specifically, officers observed ice chests and a sack containing a hydrogen chloride gas generator that was "actively offgassing," two half-full cans of Coleman fuel, sacks of lithium battery components, coffee filters, tubing, and a container with blue-tinted "sludge." One task force member testified that, during the investigation, officers "learned" that Wells was the unidentified male living with Young and that he was in fact manufacturing methamphetamine. In addition to the discoveries made in the outbuilding, agents discovered a plastic spoon bearing white residue in a room that Young identified as Wells's bedroom.

The government also offered the testimony of Donovan Wyse, a "jailhouse snitch" who was Wells's cellmate for the month immediately preceding trial. According to Wyse, Wells admitted to cooking methamphetamine at the Swisher House "three or four times." Additionally, Wyse testified that Wells told him about

"a lab in Tiffin that also got raided" and how, at that lab, Young and another unidentified individual would acquire anhydrous ammonia, "call [Wells] up and tell [Wells] that they had it so [Wells] could cook there." Bruce Cotton, another jailhouse snitch and former cellmate of Wells's, also testified against Wells. According to Cotton, Wells stated that he taught Jeff and Andy how to perfect their respective methamphetamine recipes at the Swisher House and that he also manufactured methamphetamine with Young at an undisclosed farmhouse in Tiffin.

Despite this testimony, law enforcement conceded at trial that, much like the Swisher House, no physical evidence linked Wells to the Tiffin House. Specifically, Wells's fingerprints were not found on any of the methamphetamine-making equipment and ingredients in the outbuilding. The only fingerprints recovered were lifted off of an empty Coleman fuel can and belonged to Dawn Bean. Indeed, one of the agents conducting the search admitted that officials found no physical evidence that Wells was ever present in the outbuilding or even on the Tiffin House property. Moreover, Young testified that he and Wells had only "squatted" on the property for "probably four nights," and he conceded that, when he told law enforcement during the search that the items in the outbuilding belonged to Wells, he really did not know whether they belonged to Wells or a prior occupant.

Finally, the government presented extensive testimony concerning methamphetamine manufacturing, distribution, and consumption at 1410 Hickory Hollow ("Hickory Hollow"), as well as in the surrounding wooded area where Wells himself allegedly cooked methamphetamine. For instance, Andy testified that he lived at Hickory Hollow from 2005 or 2006 until the summer of 2008 and that soon after he moved into Hickory Hollow, Wells began manufacturing methamphetamine there once a week. Specifically, Andy and others testified that Wells used a two-stage methamphetamine-manufacturing process. First, he conducted the more hazardous anhydrous-ammonia phase "in the woods out in front of the house." The second stage moved to the upstairs portion of the house for the final "bubbling, finishing" phase.

-4-

Andy also testified that Wells cooked at Hickory Hollow with his nephew, Scotty Abram, Tony Brown, and "Lil Nick," an individual identified by several witnesses as Wells's frequent companion. Indeed, Abram testified as follows regarding Wells's relationship with Lil Nick:

> Q.: Do you know Lil Nick?
>
> A. [by Abram]: Yes.
>
> Q.: What is the relationship between Lil Nick and the defendant?
>
> A.: They were good friends, *right hand/left hand kind of partners*.
>
> Q.: *Partners in what?*
>
> A.: *Cooking.*
>
> Q.: Was Lil Nick responsible for one part of the cook versus the other? What was his role?
>
> A.: His role I would say was anhydrous, but there was no responsibility on any side of the cooking, but that would be one of his roles.
>
> Q.: He would be responsible for obtaining the anhydrous ammonia?
>
> A.: Correct.

(Emphasis added.)

Andy also testified that he would "just grab little supplies if [Wells] needed" but stressed that he "wasn't really participating that much at the beginning." Nevertheless, Andy admitted that, "on occasion," he would purchase coffee filters, Coleman fuel, and pseudoephedrine and that he witnessed Wells cook methamphetamine 15 to 20

times at Hickory Hollow, eventually learning the method himself through observation. Still, Andy maintained that he and Wells had no formal manufacturing agreement but that when Wells cooked methamphetamine at Hickory Hollow, Wells gave him some for personal consumption.

Finally, Marjorie Churchill Hadrich testified that, in June 2008, she began purchasing methamphetamine from Wells and that, soon thereafter, she began supplying him with methamphetamine precursors including pitchers, spoons, camping fuel, and muriatic acid. According to Hadrich, Wells would either call her and ask her to retrieve these items, or she would call him and ask if he needed any. "Quite frequently," she also drove Wells around to pick up various precursors and "was sometimes involved in part of the preparation process as far as gathering supplies." Hadrich also rode around with Wells on three separate occasions looking for tanks from which he could siphon anhydrous ammonia. Finally, Hadrich confirmed that she knew Wells cooked methamphetamine with "several people," including "Nick," "Jenaya," and "Wes."

On January 6, 2010, at the close of the government's case, Wells moved for a judgment of acquittal on the conspiracy count. Wells contended that the government failed to adduce sufficient evidence for any reasonable juror to find that Wells entered into an agreement with anyone to manufacture methamphetamine. Wells's counsel argued that

> [w]e have all kinds of testimony about trading and selling, but we have had no testimony that he entered into an agreement to manufacture with any one of these multiple witnesses the government has called and that is an element of the crime charged, that there be an agreement to manufacture and no one has testified that they entered into an agreement to manufacture. In fact, no one has even seen him manufacture. It is all supposition[,] therefore I feel a reasonable juror would not be able to conclude a finding of guilt.

The district court denied Wells's motion. The jury found Wells guilty on the conspiracy count, and the district court sentenced Wells to the mandatory-minimum term of life imprisonment.

## II. *Discussion*

Wells now appeals, contending that there is insufficient evidence of an actual agreement between himself and another to manufacture methamphetamine. Additionally, Wells maintains that the district court plainly erred by admitting certain items into evidence and that his trial lawyer rendered ineffective assistance of counsel.

### A. *Sufficiency of the Evidence*

On appeal, Wells first maintains that the government presented insufficient evidence of his involvement in a conspiracy to manufacture methamphetamine. The standard of review governing sufficiency-of-the-evidence challenges is extremely deferential to the underlying guilty verdict and raises a high bar for a defendant to overcome:

> Although we review the district court's denial of a motion for judgment of acquittal de novo, the underlying standard of review is highly deferential to the jury's verdict. We reverse only if no reasonable jury could have found [the defendant] guilty beyond a reasonable doubt. We view the evidence in the light most favorable to the guilty verdict, granting all reasonable inferences that are supported by that evidence. The standard for reviewing a claim of insufficient evidence is strict, and a jury's guilty verdict should not be overturned lightly.

*United States v. Van Nguyen*, 602 F.3d 886, 897 (8th Cir. 2010) (internal quotations and citations omitted). "This 'very strict' standard allows us to reverse a jury 'conviction only if we conclude that no reasonable jury could have found the accused guilty beyond a reasonable doubt. Moreover, in making this determination, we may not weigh the evidence or assess the credibility of witnesses.'" *United States v. Malloy*,

614 F.3d 852, 861 (8th Cir. 2010) (quoting *United States v. Nolen*, 536 F.3d 834, 842 (8th Cir. 2008)).

To convict Wells of conspiring to manufacture methamphetamine, "the government had to prove that: (1) an agreement to manufacture methamphetamine existed; (2) [Wells] voluntarily and intentionally joined the agreement, either at the outset or later; and (3) at the time he joined the agreement, [Wells] knew the purpose of the agreement was to manufacture methamphetamine." *Id.* "A defendant's agreement to enter a conspiracy does not have to be explicit, but can consist of a tacit or implicit understanding." *United States v. Weston*, 443 F.3d 661, 669 (8th Cir. 2006). Relatedly, "[p]roof of a defendant's involvement in a conspiracy may of course be demonstrated by direct or circumstantial evidence." *United States v. Lopez*, 443 F.3d 1026, 1030 (8th Cir. 2006) (en banc).

We hold that sufficient evidence supports Wells's conviction. The record supports the jury's finding that he entered into an agreement with at least one other person to manufacture methamphetamine. Andy testified at trial that Wells regularly cooked at Hickory Hollow with his nephew, Abram, Brown, and Lil Nick. Likewise, at trial, Abram characterized Wells's and Lil Nick's relationship as "right hand/left hand kind of partners" in "[c]ooking," and he testified that Lil Nick typically furnished the anhydrous ammonia. Further, Hadrich testified that she knew Wells cooked methamphetamine with "several people," including "Nick," "Jenaya," and "Wes." In addition to this direct evidence of Wells's participation in the methamphetamine conspiracy, Hadrich testified that she frequently chauffeured or accompanied Wells when he went shopping for methamphetamine precursors. Moreover, codefendant Jeff testified that he assisted Wells in manufacturing methamphetamine at Hickory Hollow "probably three or four times," although his assistance was limited to "[j]ust providing [Wells] the location and probably g[iving] him anhydrous [ammonia] a couple of times." As we have observed, "'a defendant may be convicted for even a minor role in a conspiracy, so long as the government proves beyond a reasonable doubt that he

or she was a member of the conspiracy.'" *United States v. Smith*, 487 F.3d 618, 620 (8th Cir. 2007) (quoting *Lopez*, 443 F.3d at 1030). Finally, Wells's former cellmate, Cotton, testified that Wells bragged to Cotton that he taught Jeff and Andy how to perfect their respective methamphetamine recipes at the Swisher House and that he also manufactured methamphetamine with Young at an undisclosed farmhouse in Tiffin.

Wells fails to diminish the sufficiency of this evidence. For instance, he argues that the government actually charged few of his coconspirators. This fact is immaterial because the indictment explicitly alleged that Wells conspired with his codefendants *and* "with other persons" unnamed and uncharged, and "a person can be convicted of conspiracy with an unnamed person." *United States v. Galvan*, 961 F.2d 738, 742 n.6 (8th Cir. 1992) (citing *Rogers v. United States*, 340 U.S. 367, 375 (1951)). Also, trial testimony confirmed that the majority of Wells's activities with these unnamed persons fell within the time period alleged in the indictment. The indictment charged a conspiracy "beginning on a date unknown to the Grand Jury, but beginning *no later than during or about the Fall of 2007, and continuing to on or about March 20, 2009*." (Emphasis added.) Andy testified that he lived at Hickory Hollow from 2005 or 2006 until the summer of 2008 and that soon after he moved into Hickory Hollow, Wells began manufacturing methamphetamine there once a week. Likewise, Hadrich testified that in June 2008 she began purchasing methamphetamine from Wells and that, soon thereafter, she began supplying him with various methamphetamine precursors. The majority of this period falls squarely within the indicted time frame, and, thus, the proof does not impermissibly vary from the indictment. *See United States v. Moore*, 639 F.3d 443, 446 (8th Cir. 2011) ("A variance exists when the evidence proves facts that are materially different from those alleged in the indictment." (quotation and citation omitted)). At any rate, "[w]hen," as in Wells's case,

the date of the offense is not an element of the charge, we have held on many occasions that a variance between the indictment date and the proof at trial is not fatal so long as the acts charged were committed within the statute of limitations period, and prior to the return date of the indictment.

*Id.* at 447 (quotation and citation omitted). Finally, Wells's conviction is not rendered legally infirm simply because much of the testimony linking Wells to the conspiracy came from "jailhouse snitches" and codefendants. Such considerations bear on those witnesses' credibility, and "[i]t is not our province on appeal to reweigh the evidence or judge the credibility of witnesses when reviewing the sufficiency of the evidence." *United States v. Anderson*, 78 F.3d 420, 422 (8th Cir. 2008).

Thus, sufficient evidence exists to sustain Wells's conviction for conspiring with others to manufacture methamphetamine.

### B. *Admission of Certain Evidence*

In his next point on appeal, Wells contends that the district court committed plain error in (1) allowing the jury to hear testimony from a law enforcement official that Wells maintained a "safe house," (2) admitting into evidence letters addressed to Wells that were found at the Tiffin House, and (3) admitting into evidence photos of contraband in Wells's vehicle. Wells did not object at trial to the admission of any of this evidence. He now maintains that this evidence was unduly prejudicial, presumably pursuant to Federal Rule of Evidence 403.

When a defendant fails at trial to interpose a timely objection to the introduction of evidence that the district court admits, this court reviews that evidence's admission only for plain error. *United States v. Adamson*, 608 F.3d 1049, 1055 (8th Cir. 2010) (citing *United States v. Marcus*, 130 S. Ct. 2159, 2163–64 (2010)). "To establish plain error [a defendant] must demonstrate that (1) there was an error that he did not affirmatively waive, (2) the error was clear and obvious, (3) the error affected his

substantial rights, and (4) the error seriously affected the fairness, integrity or public reputation of judicial proceedings." *Id.* Wells has wholly failed to show how the admission of any of this evidence constituted plain error. Even assuming that there was error, Wells has not shown that any of these errors affected his substantial rights or the fairness, integrity, or public reputation of the proceedings. Accordingly, the district court did not plainly err in admitting this evidence.

## C. *Trial Counsel's Alleged Ineffectiveness*

Finally, citing his trial counsel's failure to object to the aforementioned evidence and alleging that his trial counsel fell asleep during trial, Wells now urges that he is entitled to a new trial on the basis that he received ineffective assistance of counsel. "'[G]enerally, ineffective assistance of counsel claims are better left for post-conviction proceedings.'" *United States v. Rice*, 449 F.3d 887, 897 (8th Cir. 2006) (quoting *United States v. Cook*, 356 F.3d 913, 917 (8th Cir. 2004)). Still, we routinely review ineffective-assistance claims on direct appeal where "the record is fully developed because the district court held an evidentiary hearing at which it allowed [the defendant] to present evidence regarding the alleged ineffective assistance of counsel." *Id.* In Wells's case, no such record has been developed. Namely, Wells did not ask the district court to hold an evidentiary hearing on his trial counsel's alleged ineffectiveness, and, consequently, none was held. Thus, we decline review of Wells's ineffective-assistance claims at this time.

## III. *Conclusion*

Based on the foregoing, we affirm.

_____