Justice Thomas,
concurring in the judgment.
I agree with the Court that the Indiana crime of intentional vehicular flight, Ind. Code § 35-44-3-3(b)(1)(A) (2004), is a “violent felony” under the Armed Career Criminal Act (ACCA), 18 U. S. C. § 924(e)(2)(B)(ii). The majority also correctly refuses to apply the “purposeful, violent, and aggressive” test created in Begay v. United States, 553 U. S. 137, 145 (2008). However, the majority errs by implying that the “purposeful, violent, and aggressive” test may still apply to offenses “akin to strict-liability, negligence, and recklessness crimes.” Ante, at 13.
The error in imposing that test, which does not appear in ACCA, is well catalogued. See, e. g., Begay, 553 U. S., at 150-152 (Scalia, J., concurring in judgment); id., at 158-159 (Alito, J., dissenting); ante, at 13 (finding “no precise textual link” in the statute). I agree with Justices Scalia and *17 Kagan that the majority’s partial retreat from Begay only further muddies ACCA’s residual clause. Post, at 28 (Scalia, J., dissenting); post, at 36-37, n. 1 (Kagan, J., dissenting).
The only question here is whether, in the ordinary case, using a vehicle to knowingly flee from the police after being ordered to stop “involves conduct that presents a serious potential risk of physical injury to another.” § 924(e)(2) (B)(ii). I believe that it does. Therefore I concur in the judgment.
I
Under Indiana law, intentional vehicular flight is a felony. Any person who “knowingly or intentionally . . . flees from a law enforcement officer after the officer has, by visible or audible means, identified himself and ordered the person to stop” commits a misdemeanor. Ind. Code § 35-44-3-3(a)(3). If the person “uses a vehicle” to flee, however, the offense is elevated to a class D felony. § 3(b)(1)(A). That felony, the parties agree, qualifies as a “violent felony” under ACCA if it is “burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.” 18 U. S. C. §924(e)(2)(B)(ii).
As explained below, Indiana’s crime of intentional vehicular flight “involves conduct that presents a serious potential risk of physical injury to another.” Ibid. The elements of § 3(b)(1)(A), compared to those of the enumerated ACCA offense of burglary, suggest that an ordinary violation of § 3(b)(1)(A) is far riskier than an ordinary burglary. Statistics, common experience, and Indiana cases support this conclusion.
A
The specific crimes Congress listed as “violent felon[ies]” in ACCA — arson, extortion, burglary, and use of explosives — provide a “baseline against which to measure the degree of risk” that a nonenumerated offense must present in *18 order to qualify as a violent felony. James v. United States, 550 U. S. 192, 208 (2007); see also ante, at 8. Burglary, for instance, sets a low baseline level for risk. Its elements are “unlawful or unprivileged entry into, or remaining in, a building or structure, with intent to commit a crime.” Taylor v. United States, 495 U. S. 575, 599 (1990). As this Court has recognized, the risk of burglary is in “the possibility that an innocent person might appear while the crime is in progress” and the danger inherent in such a “face-to-face confrontation.” James, 550 U. S., at 203. The chance of an interruption or confrontation in an ordinary burglary is, of course, quite small; burglars generally plan and commit their crimes with an eye toward avoiding detection. Nevertheless, that small chance sufficed for Congress to list burglary as a “violent felony,” and for this Court to hold that attempted burglary also qualifies. See id., at 195.
Compared to burglary, the elements of intentional vehicular flight describe conduct that ordinarily poses greater potential risk. Although interruption and confrontation are quite rare for burglary, every § 3(a)(3) flight is committed in the presence of a police officer. Every § 3(a)(3) flight also involves a perpetrator acting in knowing defiance of an officer’s direct order to stop, “which is a clear challenge to the officer’s authority and typically initiates pursuit.” United States v. Harrimon, 568 F. 3d 531, 535 (CA5 2009); see also United States v. Spells, 537 F. 3d 743, 752 (CA7 2008) (“Taking flight calls the officer to give chase, and aside from any accompanying risk to pedestrians and other motorists, such flight dares the officer to needlessly endanger himself in pursuit”). Finally, in every § 3(b)(1)(A) flight, the perpetrator is armed with what can be a deadly weapon: a vehicle. See, e. g., Scott v. Harris, 550 U. S. 372, 383 (2007) (noting that “the threat posed by the flight on foot of an unarmed suspect” was not “even remotely comparable to the extreme danger to human life” posed by that vehicular chase); United States v. Kendrick, 423 F. 3d 803, 809 (CA8 2005) (“[T]he *19 dangerous circumstances surrounding a person's attempt to flee from law enforcement are compounded by the person’s operation of a motor vehicle”); United States v. Aceves-Rosales, 832 F. 2d 1155, 1157 (CA9 1987) (per curiam) (“It is indisputable that an automobile . . . can be used as a deadly weapon”).
In sum, every violation of § 3(b)(1)(A) involves a defiant suspect with a dangerous weapon committing a felony in front of a police officer. Based on its elements, the potential risk of intentional vehicular flight resembles “armed burglary in the presence of a security guard” more than simple burglary. Section 3(b)(1)(A) outlaws conduct with much more risk — a far greater likelihood of confrontation with police and a greater chance of violence in that confrontation— than burglary. It follows that the “the conduct encompassed by the elements of the offense, in the ordinary case,” poses a greater risk of harm than the enumerated offense of burglary. James, supra, at 208.
B
Common experience and statistical evidence confirm the “potential risk” of intentional vehicular flight. Cf. Chambers v. United States, 555 U. S. 122, 129 (2009) (statistical evidence, though not always necessary, “strongly supports the intuitive belief that failure to report does not involve a serious potential risk of physical injury”). Data from the National Highway Traffic Safety Administration show that approximately 100 police officers, pedestrians, and occupants of other cars are killed each year in chase-related crashes. National Center for Statistics & Analysis, Fatalities in Motor Vehicle Traffic Crashes Involving Police in Pursuit 37-56 (2010) (reporting 1,269 such deaths between 2000 and 2009).
The number injured must be much higher. Many thousands of police chases occur every year. In California and Pennsylvania, which collect statewide pursuit data, police were involved in a combined total of more than 8,700 chases *20 in 2007 alone. See Pennsylvania State Police Bureau of Research & Development, Police Pursuits 2007 Annual Report; Report to the Legislature, Senate Bill 719, California Police Pursuits (Mar. 2008); see also Schultz, Hudak, & Alpert, Emergency Driving and Pursuits, FBI Law Enforcement Bulletin, Apr. 2009, pp. 1,4 (surveying more than 2,100 police officers and finding an average of just over one pursuit per officer each year). And up to 41% of all chases involve a crash, which always carries some risk of injury. Wells & Falcone, Research on Police Pursuits: Advantages of Multiple Data Collection Strategies, 20 Policing: Int’l J. Police Strategies & Management 729, 740 (1997) (citing nine studies, each showing a crash rate between 18% and 41%). Indeed, studies show that 4% to 17% of all chases actually cause injury. Ibid.; see also C. Lum & G. Fachner, Police Pursuits in an Age of Innovation and Reform 57 (2008) (finding that 23.5% of flights involve a crash, and 9% of flights cause injury).
An International Association of Chiefs of Police study of 7,737 pursuits across 30 States found 900 injuries, of which 313 were to police or bystanders. Ibid. As the majority observes, that injury rate is just over four injuries per 100 chases, excluding injuries to the perpetrator. Ante, at 11. By comparison, the injury rate for burglary and arson is around three injuries per 100 crimes, or less. Ibid.; see also Harrimon, supra, at 537 (citing similar arson statistics, showing between one and three injuries per 100 fires, apparently including injuries to perpetrators). Statistics support what logic suggests: The ordinary case of intentional vehicular flight is risky, indeed, more so than some offenses listed in ACCA.
These statistical risks of intentional flight merely reinforce common sense and real world experience. See, e. g., Carroll & Woomer, Family Killed in Visalia Crash After Man Flees From Sheriff’s Deputy, Visalia Times-Delta, Apr. 2-3, *21 2011, p. 1A; Broward & Butler, Fleeing Car Hits Another; 5 People Injured, Florida Times-Union, Mar. 15, 2011, p. C2; Klopott, Crash During Police Chase Kills Father of Four, Washington Examiner, Nov. 22, 2010, p. 4; Fenton, Woman Killed During Pursuit Identified, Baltimore Sun, July 27, 2010, p. 4A (reporting that a woman was killed when a fleeing suspect crashed into her car); Rein & Hohmann, Crashes, Injuries Left in Wake of Pr. George’s-Baltimore Chase, Washington Post, Nov. 22, 2009, p. C3 (noting injuries to two police officers and an innocent motorist).
Also well known are the lawsuits that result from these chases. See, e. g., Bowes, Claim Settled in Death of Officer, Richmond Times-Dispatch, Mar. 28, 2007, p. B1 ($2.35 million settlement for the family of an off-duty police officer killed in a head-on collision with a police car chasing a suspect); Cuculiansky, Stop-Stick Death Suit Settled, Daytona Beach News-Journal, Aug. 4, 2010, p. 1C ($100,000 settlement for the family of a man killed by a fleeing vehicle); Ostendorff, Woman Sues City Police, Asheville Citizen-Times, June 17, 2010, p. A1 (woman sued police after they fired 10 shots into the fleeing car she was riding in, wounding her); Gates, $375,000 Awarded in Crash Lawsuit, Jackson, Miss., Clarion-Ledger, May 9, 2010, p. 1B (noting four police-chase lawsuits won against the city in a single year and describing an opinion awarding $375,000 to an injured third party); Pal-íasela, $17.5 Million Awarded to Motorist Disabled in Police Chase, Chicago Sun Times, Mar. 23, 2005, p. 18. In the real world, everyone — police, citizens, and suspects who elect to flee — knows that vehicular flight is dangerous.
C
Convictions under § 3(b)(1)(A) further support this conclusion. See, e. g., Mason v. State, 944 N. E. 2d 68, 69-70 (Ind. App. 2011) (defendant suddenly drove his car toward police officers, who then fired at him; he crashed into other cars *22 and was Tasered); Jones v. State, 938 N. E. 2d 1248, 1253 (Ind. App. 2010) (defendant accelerated and crashed into a police car); Haney v. State, 2010 WL 305813, *1 (Ind. App., Jan. 27, 2010) (defendant, who had been speeding, drove into a yard, between two houses, and then into a field where he crashed into a tree); Hape v. State, 903 N. E. 2d 977, 984, 985, n. 4, 994 (Ind. App. 2009) (defendant fled for 40 minutes, at times in excess of 100 mph and into oncoming traffic; police fired at his truck at least 20 times; he was captured only after driving into a flooded area); Smith v. State, 2009 WL 1766526, *1 (Ind. App., June 23, 2009) (defendant led police on a stop-and-go chase for five minutes, which included traveling at 30 mph through a stop sign and crowded parking lot; he ultimately had to be chemical sprayed); Butler v. State, 2009 WL 2706123, *1 (Ind. App., Aug. 28, 2009) (defendant led a chase at speeds up to 80 mph, swerved into the path of an oncoming vehicle, and eventually jumped from the car while it was still moving); Amore v. State, 2008 WL 1032611, *1 (Ind. App., Apr. 11, 2008) (defendant led police on a 15-mile chase at speeds up to 125 mph, ending in a crash); Johnson v. State, 2008 WL 131195, *1 (Ind. App., Jan. 14, 2008) (defendant led a chase at 65-70 mph at 1 a.m. with no tail lights, crashed his car, and caused a police car to crash); Tinder v. State, 2008 WL 540772, *1, *3 (Ind. App., Feb. 29, 2008) (rev’g on other grounds) (defendant led a 12:30 a.m. chase, which ended when he ran off the road, crashed through a corn silo, and hit a fence). Although these cases are only a limited collection, their facts illustrate that convictions under § 3(b)(1)(A) often involve highly dangerous conduct.
II
Sykes argues that intentional vehicular flight is not a violent felony for two main reasons. First, he asserts that it is possible to violate Indiana’s intentional vehicular flight statute without doing anything dangerous. Second, he urges *23 that the existence of Ind. Code § 35-44-3-3(b)(l)(B), which includes “substantial risk” as an additional element, indicates that § 3(b)(1)(A) is nonrisky. Neither argument is persuasive.
A
Sykes observes that it would violate the statute to flee at low speed, obeying traffic signs and stopping after only a short distance. See Woodward v. State, 770 N. E. 2d 897, 900-901 (Ind. App. 2002); post, at 38 (Kagan, J., dissenting). Such a flight, he urges, would not present “a serious potential risk of physical injury to another,” so a conviction under the statute cannot categorically be a violent felony.
The fact that Sykes can imagine a nonrisky way to violate § 3(b)(1)(A) does not disprove that intentional vehicular flight is dangerous “in the ordinary ease.” See James, 550 U. S., at 208. It is also possible to imagine committing burglary — an enumerated offense — under circumstances that pose virtually no risk of physical injury. See id., at 207 (hypothesizing a “break-in of an unoccupied structure located far off the beaten path and away from any potential intervenors”).
Nor has Sykes established that the nonrisky scenario he imagines is the ordinary violation of § 3(b)(1)(A). Sykes offers nothing more than two Indiana cases that, in his view, are instances of nonrisky vehicular flight. See Swain v. State, 2010 WL 623720 (Ind. App., Feb. 23, 2010); Woodward, supra, at 898. Yet not even those cases obviously involve nonrisky conduct. In Swain, the defendant was a getaway driver who picked up her boyfriend’s accomplice as he ran on foot from two police officers. 2010 WL 623720, *1, *3. As the officers approached the car and shouted to stop, she yelled, “ ‘Hurry up. Come on. They’re coming,’ ” and drove off as the runner jumped in. Id., at *1. She stopped 10 to 15 seconds later, when police vehicles converging on the scene took up pursuit. Ibid. In Woodward, the defendant *24 ignored a police siren for approximately a mile, passed several good places to pull over, and drove all the way home, but traveled at the speed limit of 45 mph and obeyed traffic laws. 770 N. E. 2d, at 898. Eventually the defendant got out of his car and shouted profanities at the officer, who drew his pistol. Id., at 898, 901; see also id., at 901, 902 (observing that the defendant had refused to stop “except on his own terms” and noting “the dangers that could await a police officer stopping where the citizen selects”). These two cases fall well short of showing that intentional flight in Indiana is ordinarily nonrisky.[1] See also post, at 41 (Kagan, J., dissenting) (noting that the “intuition that dangerous flights outstrip mere failures to stop... seems consistent with common sense and experience”).
B
Sykes also notes that a different subparagraph, §3(b) (1)(B), covers intentional flight committed while “operating] a vehicle in a manner that creates a substantial risk of bodily injury to another person,” whereas § 3(b)(1)(A) has no such element. From this, Sykes infers that § 3(b)(1)(A) necessarily concerns only flight that does not present a serious potential risk. The argument is that, even though the elements of § 3(b)(1)(A) describe conduct that ordinarily will satisfy the requisite level of risk, the presence of § 3(b)(1)(B) casts § 3(b)(1)(A) in a less dangerous light. Post, at 43-44 (Kagan, J., dissenting). But the fact that § 3(b)(1)(B) includes “substantial risk of bodily injury” as an element does not restrict § 3(b)(1)(A) to nonrisky conduct.
First, apart from the existence of § 3(b)(1)(B), the absence of risk as an element of § 3(b)(1)(A) does not mean that the *25 offense is not a violent felony. ACCA does not require that a violent felony expressly include a risk of injury as an element of the offense. Enumerated violent felonies like arson and burglary have no such element.
Second, § 3(b)(1)(B) is not a risky, aggravated version of § 3(b)(1)(A). Both are class D felonies, and at the time of Sykes’ conviction, there was no statutory difference in punishment between them. Even now, the offenses remain of a single class, meriting similar punishments.
The similarity in punishment for these related, overlapping offenses suggests that § 3(b)(1)(A) is the rough equivalent of one type of § 3(b)(1)(B) violation. Section 3(b)(1)(B) enhances punishments for three separate types of intentional misdemeanors: obstructing an officer, § 3(a)(1); interfering with service of process, § 3(a)(2); and fleeing from a police officer, § 3(a)(3). Under § 3(b)(1)(B), committing any of those offenses while also drawing a deadly weapon, inflicting injury, or “operat[ing] a vehicle in a maimer that creates a substantial risk of bodily injury to another person" has long-been a class D felony.
Tn 1998, the Tndiana Legislature added § 3(b)(1)(A) to provide that any use of a vehicle to flee from an officer under § 3(a)(3) is always a class D felony. Section 3(b)(1)(A) is, in effect, a shortcut to the same punishment for one particular violation of § 3(b)(1)(B).[2] It is still the case that under *26 § 3(b)(1)(B), using a vehicle to obstruct an officer or interfere with service of process is a class D felony only if the vehicle is “operate[d3... in a manner that creates a substantial risk of bodily injury to another person.” But using a vehicle to intentionally flee is always a class D felony, without any need to prove risk. § 3(b)(1)(A).
This rough equivalence between § 3(b)(1)(A) and §3(b) (1)(B) is borne out in Indiana case law. The conduct underlying the Indiana cases discussed above, see supra, at 21-22, demonstrates that despite § 3(b)(1)(B), convictions under § 3(b)(1)(A) include risky flights.
Third, the remainder of Indiana’s resisting law enforcement statute confirms that its other provisions do not reserve § 3(b)(1)(A) for nonrisky conduct. An intentional vehicular flight becomes a class C felony if the vehicle is operated “in a manner that causes serious bodily injury.” Ind. Code § 35-44-3-3(b)(2). The same act becomes a class *27 B felony if someone is killed. § 35-44-3-3(b)(3).[3] Justice Kagan asserts that each of these “separate, escalating crimes” captures an increasing degree of risk and necessarily means that § 3(b)(1)(A), the offense simpliciter, is less risky than it otherwise seems. Post, at 42.
The flaw in this reasoning is that §§ 3(b)(2) and (3) enhance punishment based solely on the results of the flight, not the degree of risk it posed. Neither provision requires any action by a suspect beyond that which satisfies the elements of § 3(b)(1)(A).[4] Rather, each provision addresses what happens when the risk inherent in a violation of § 3(b)(1)(A) is actualized and someone is hurt or killed. The risk of physical injury inherent in intentional vehicular flight simpliciter was apparently clear enough to spur the Indiana Legislature to specify greater penalties for the inevitable occasions when physical injury actually occurs. By comparison, for obviously nonrisky felonies like insurance fraud or misappropriation of escrow funds, legislatures do not specify what additional punishment is warranted when the crime kills or injures bystanders or police. See, e. g., Ind. Code § 35-43-5-7.2; § 35-43-9-7. In sum, §§ 3(b)(2) and (3) do not demonstrate that § 3(b)(1)(A) is less risky than it otherwise seems, but instead support the idea that it is inherently risky.
* * *
Looking to the elements, statistics, common experience, and cases, I conclude that in the ordinary case, Indiana’s crime of intentional vehicular flight, § 3(b)(1)(A), “involves conduct that presents a serious potential risk of physical in *28 jury to another.” 18 U. S. C. § 924(e)(2)(B)(ii). The crime is therefore a violent felony under ACCA.

 Sykes certainly cannot use his own flight as an example. His § 3(b)(1)(A) conviction was based on fleeing from police in a damaged car at night without headlights, driving on the wrong side of the road, weaving through traffic, barreling through two yards and among bystanders, destroying a fence, and crashing into a house. Ante, at 6; 2 App. 11 (Sealed).

 Indiana law at the time of Sykes’ conviction presented two related provisions, within a single statute, carrying the same punishment. One wao a broad provision that had risk ao an element* and the other was a narrower provision that did not. While Justice Kagan would infer that the offence lacking risk as an element woo likely not ordinarily risky, poet, at 41-43,1 think it makes more sense to infer the opposite.
Consider reckless endangerment statutes. In Hawaii, for instance, it is “reckless endangering in the second degree” either to “recklessly plac[e] another person in danger of death or ccriouo bodily injury,” Haw. Rev. Stat. § 707-714(1)(a) (2009 Cum. Supp.), or to “[ijntentionally discharg[e] a firearm in a populated area,” § 707-714(1)(b). I would infer that discharg *26 ing tho firearm is deemed dangerous enough por oo that the statute doe3 not require the State to prove danger in any given case. Other States have similar statutes. See, e.g., Del. Code Ann., Tit. 11, §§ 603(a)(1), (2) (2007); Wyo. Stat. Ann. §§6-2-504(a), (b) (1977-2009); Me. Rev. Stat. Ann., Tit. 17-A, §§301(1)(B)(1), (2) (Supp. 2010).
Similarly here, I infer that § 3(b)(1)(A)’s upgrade of intentional flight to a class D felony based on the use of a vehicle alone indicates that the offense inherently qualifies as, or approximates, “operat[ing] a vehicle in a manner that creates a substantial risk of bodily injury to another person” under § 3(b)(1)(B).
Justice Kagan argues that if my reading were correct, the Indiana Logiolaturo would have removed the reference to vehicular flight from § 3(b)(1)(B) when it added § 3(b)(1)(A). Post, at 47. There are at least two problems with this reasoning. First, even though § 3(b)(1)(A) may be redundant with § 3(b)(1)(B) as to the vehicular flight offenses in subsection (a)(3), the reference to “operat[ing] a vehicle” in § 3(b)(1)(B) is still independently useful for the offenses in subsections (a)(1) and (2). Thus, it is hardly strange for tho legislature to have left the reference to f‘opcrnt[ing] a vehicle” in § 3(b)(1)(B). Second, although Justice Kagan can envision a moro perfectly drafted otatutc, we do not require perfection in statutory drafting. See, e. g., Bruesewitz v. Wyeth LLC, 562 U. S. 223, 236 (2011). I think it clear enough what the statute means.

 Indiana recently added that if a polieo officer dios, it bocomos a class A felony. 2010 Ind. Acts p. 1197.

 For that matter, each provision also could be satisfied by a flight that did not satisfy § 3(b)(1)(B), which casts further doubt on Justice Kagan’s vision of the statutory scheme as a unified structure of neatly progressing offenses with corresponding risk levels and punishments. See post, at 41-42.